No. 20-17229

_____

**UNITED STATES COURTS OF APPEALS
FOR THE NINTH CIRCUIT**

_____

STEVE WILSON BRIGGS

Appellant/Petitioner

vs.

JAMES CAMERON, NEWS CORPORATION, TWENTIETH CENTURY FOX
FILM CORPORATION, ZERO GRAVITY MANAGEMENT LLC,
INTERNET ARCHIVE, LIGHTSTORM ENTERTAINMENT INC,
MICHAEL PIERCE, MARK WILLIAMS, ROBERT MARK KAMEN

Appellees/Respondents

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
Case No. CV 20-1596-VC,
Hon. Judge Vince Chhabria

_____

**OPENING BRIEF OF APPELLANT/PLAINTIFF**

**STEVE WILSON BRIGGS**

_____

Steve Wilson Briggs
4322 Chico Ave,
Santa Rosa, CA 95407
(510) 200 3763
snc.steve@gmail.com

*Appellant, In Propria Persona*

## **TABLE OF CONTENTS**

TABLE OF CONTENTS ……………………………………………….. i

TABLE OF AUTHORITIES ................................................................... iii

INTRODUCTION …………………………………………………………... 1

JURISDICTIONAL STATEMENT ……………………………………….... 8

STATEMENT OF ISSUES PRESENTED FOR REVIEW ……………………… 8

STATEMENT OF THE CASE …………………………………………………… 9

SUMMARY OF ARGUMENT ……………………………………………… 16

STANDARD OF REVIEW…………………………………………………..... 16

ARGUMENT

I.  The District's Infringement Ruling Is Improper Because:

    A. It Relies On Gross Omission, Misapplications Of Law, And Follows The 9th's Practice Of Applying A Much Lower Abstraction Test Standard For Corporations & Film Industry Plaintiffs (And Publishing Corporate Plaintiff's Claims), But When The Plaintiffs Are Actual Persons v Corporations, The 9th Applies An Impossibly High Abstraction Test Bar (And Does <u>Not Publish</u> Or Paraphrase The Claims); Eliminating Fairness, Transparency & Accountability………...………………………….. 17

    B. The Impropriety Of The District's Order Is Proven With *Twentieth Century-Fox v. MCA* (The Last Time The 9th Cited Claims Sufficient To Reverse) ……………………………….....….. 18

        a. *Twentieth Century-Fox Film Corp. v. MCA* Claims ……………... 19

        b. General Claims & History……………………………………….... 20

i

c. Plaintiff's Claims Against **Taken** ……………………………... 21

d. Plaintiff's Claims Against **Avatar** ……………………………. 29

II. The District Erred By Not Holding The Parent Corporations (News Corp, 20CFOX) Liable For ZGM's (And Future Service Inc's) Misrepresentations & Breaches.………………………………………... 33

III. The District Order Is Improper Because:
 A. The District Failed To Assess & Protect The Plaintiff's Unique Selection And Arrangement Of Unprotectable Elements ……………………………..……………………….. 35

 B. The District Failed To Provide The Plaintiff An Opportunity For Expert Testimony, **Per Skidmore v Led Zeppelin** ……….. 36

IV. The District Order Is Improper Because It Biasedly Misrepresents ALL Facts, Violates Copyright Precepts & Violates *Skidmore v Led Zeppelin* …………………………………………….... 36

V. Judge Chhabria Abused His Discretion By Imposing Himself On This Action After Judge Orrick Recused (Chhabria Presided Over 2 Of Plaintiff's 3 Prior Actions). Plaintiff Moved To Disqualify Judge Chhabria, Who Erred By Not Stepping Down ……...……………………. 38

VI. The Order Is Improper Because The District Improperly Assessed <u>Differences</u>, Rather Than <u>Similarities</u> …………………………. 40

VII. The District Failed To Give The Plaintiff's Script *Broad* Protection……... 41

VIII. The Order Is Improper, As It Unduly Dismisses The Complaint, Ignores The Defs' Criminal Internet Fraud, Threatens America's Status As A World Leader, And Threatens America Itself ………………. 42

IX. The District Order's Deep Flaws Indicate That The <u>Department Of Justice</u> (William Barr) May Have Influenced The District Order, To Protect US President Donald Trump. ………………...……….…… 44

SUMMATION …………………………………………………………... 45

    The Plaintiff's' Ideas Animate Science, Industry, And Politics ………. 45

    Plaintiff's Complaint Helps Protect The U.S. ………………………… 46

    Ramifications …………………………………………………………… 47

    Concerns ………………………………………………………………… 48

CONCLUSION …………………………………………………………… 50

STATEMENT OF RELATED CASES ………………………………….. 51

CERTIFICATE OF COMPLIANCE ……………………………………… 51

CERTIFICATE OF SERVICE …………………………………………... 51

## TABLE OF AUTHORITIES

**CASES**

*Apple Computer, Inc. v. Microsoft Corp., 3*5 F.3d at 1446 ………………….. 35, 39

*Briggs v. Blomkamp*, 70 F. Supp. 3d 1155 (2014), affirmed as
*Briggs v. Sony Pictures Entertainment, Inc*.,
714 F. App'x 712 (9th Cir. 2018) …………………………….. 4, 10, 36, 37, 47 49

*Briggs v. Spacey, et al*., 3:18-cv4952-VC (2018),
affirmed, 793 F. App'x 634 (9th Cir. 2020) …………….....14, 36, 37, 38, 39, 47, 49

*Briggs v. Universal Pictures, et a*l., 3:17-cv-6552-VC (2017) ………….. 14, 36, 37

*Cavalier v. Random House, Inc*., 297 F.3d 815, 822 (9th Cir. 2002) ……….. 17, 40

*Feist Publications, Inc. v. Rural Telephone Service Co., Inc*. (1991) …………… 41

iii

*Herrington v. Sonoma County* (9th Cir. 1987) …………………………………... 39

*Sid & Marty Krofft Tele. v. Mcdonald's Corp* …………………………..... 36, 40, 41

*L.A. Printex Indus., Inc. v. Aeropostale, Inc.* (9th Cir. 2012) …………..... 39, 40, 41

*Metcalf v Bochco*, 294 F.3d …………………………………………………… 35, 39

*Rentmeester v. Nike, Inc.*, 883 F.3d at 1117 …………………………………... 35

*Shaw v. Lindheim*, (1990) 919 F.2d 1353 …………………………………….. 38

*Skidmore v Led Zeppelin* …………………………………… 16, 32, 35, 36, 37, 49

*Twentieth Century-Fox Film Corp. v. MCA, Inc.* 715 F.2d 1327 ………... 17, 18, 19

## STATUTES

28 U.S.C. § 1331 …..……………………………………………………………… 8

28 U.S.C. § 1291 …..……………………………………………………………… 8

28 U.S.C. § 144 …..……………………………………………………………… 39

28 U.S.C. § 455(a) ……………………………………………………………… 39

## RULES

FRCP Rule 4(a)(1)(A) ……...…………………………………………………….. 8

FRCP Rule 60 …………………………………………………………………… 37

**OTHER**

Los Angeles Times ………………………………………………………… 48

Phys.org ……………………………………………………………………… 46

U.S. Sixteenth Air Force Website …………………………………………… 3

U.S. Patent and Trademark Office …………………………………………... 5

Wikileaks …………………………………………………………………… 4

## **INTRODUCTION**

In May 2005, after 17 months' work, the Appellant/**Plaintiff** completed a revolutionary screenplay (**Script**) that would have a resounding impact on the film world. Beyond its countless conventional copyrightable expressions, the Script also contained 6-12 profoundly original ideas and story-telling approaches, such as:

1. The Script is <u>the first to feature a hero whose goal, first act to last, is to fight for, and go to impossible lengths for, the life of his child (or family member)</u>.

- This family-centric plot/goal structure, not done before in sci-fi (<u>or any genre</u>), made sci-fi matter to viewers who might not otherwise enjoy sci-fi.

- This new *noble fight for family* theme moved international story-telling.

2. The Script is the first sci-fi (or adventure, fantasy) script to break convention and (1) take a panoply of the most divisive current political and social issues and impose them on a sci-fi canvas, then (2) <u>amplify</u> these issues.

- This change, also, made sci-fi meaningful to non sci-fi fans.

3. The Script featured the conceptual technology of a **mind/soul/body scanner**, used to make digital reproductions of actual people—with minds and souls.

4. The Script **(1)** took a panoply of modern religious and spiritual issues, and imposed them on a new sci-fi canvas, then (2) <u>amplified</u> these aspects.

- Prior to the Script, modern religion and God were forbidden in sci-fi films (and many genres) in favor of the safe good/bad, light/dark fairytale model.

Soon, countless writers were emulating the Plaintiff's (1) heroic fight for family (*Taken, Sleepless, Skyscraper*); (2) dystopic sci-fi-scape, plagued by today's politics, where a father fights for his kid—or a person fights for a family member (*Hunger Games, The Last of Us, Elysium*); (3) idealistic warrior woman, fighting for her right to hope (Divergent). **All of these came from the Plaintiff**.

The Script contained many more new ideas: 1. aggregated data, 2. an orbiting satellite city for the super-rich, 3. a digital Earth/Universe simulator/accelerator….

This suit is unique, in that the Defendants (**Defs**) are accused of infringing the Plaintiff's screenplay to make <u>two</u> infringing films: ***Taken*** and ***Avatar***.

The District errantly ruled that the Plaintiff's claims are not similar to the Defs' work; supporting this by misapplying law, omitting 13,000 words of Plaintiff's infringement claims (quoting only 9 words), and many other failures.

To infringe the Script, the Defs released fraudulent web articles, which claimed James Cameron wrote a script called *Project 880* in June 2005; the Defs later revised this, to claim *Project 880* was based on an "*Avatar*" *scriptment*, penned in 1996. <u>Internet Archive</u> (**IA**) then made fake *crawls* of the articles, and Google's *Chrome* browser displayed false URLs of the fake crawls.

Beyond this, the Complaint and pleadings show the Defs hacked into the Plaintiff's computer, to steal and infringe **many** of his scripts**,** and <u>the Plaintiff's pleadings actually identify the hackers and hacking agencies by name</u>.

**The Plaintiff's Pleadings Identify The Hackers By Name**

Plaintiff informed the District that the Defs hacked into his computer for 20+ years[1], using the companies ***Liberate Technologies***[2] (1999-2005) and ***Movielabs*** (2006-2020).[3] These companies employed the same hackers: **Steve Weinstein**, Raymond Drewry, Craig Seidel, Jim Helman. <u>Weinstein (Movielabs' CEO) teaches "**Hacking For Defense**," to U.S. intelligence prospects, at **Stanford University**</u>.



The caption of the screenshot above (from the 16th Air Force website) reads:

"Innovative approach to defense challenges
"**Steve Weinstein**, Stanford University professor, speaks to a group of students during a **Hacking for Defense** class in Silicon Valley, California, Feb. 12, 2018. <u>H4D is a non-profit program between Stanford students and military or adjacent industries that focuses on solving national security issues</u>."

(See https://www.16af.af.mil/News/Photos/igphoto/2001899947/)

---

[1] See Plaintiff's Fourth Request For Judicial Notice. (ER 35-42)
[2] Liberate Technologies closed, after securities fraud charges, in 2005. (ER 54, 55)
[3] The Defs also used *Electronics For Imaging, Inc* (**EFI**) to hack, from 2013-2020.

**Email Records Show Six (6) Major Film Studios Owned
MovieLabs —And Used It To Steal The Plaintiff's Works,**

The Plaintiff's filings show the <u>Motion Picture Association</u> (**MPA**) owns **Movielabs**. The MPA is owned by Universal, Warner Bros, Paramount, Sony, Disney, Netflix (20th Century Fox).[4] The six MPA partners used MovieLabs to hack into the Plaintiff's laptop and steal his works, to make many infringing films.

<u>The Plaintiff's ideas became **vital** to the film industry</u>. This is proven in a Nov 2013 email, from Mitch Singer (Sony's CSO and MovieLabs board member) to Leah Weil (Sony's legal counsel), leaked by Wikileaks in 2014. Singer writes:

> MovieLabs Budget
> Leah,
> I'm in a Movielabs Board meeting and **<u>based on the increase in the number projects and the importance of many of their projects to the industry</u>**, they will be asking for a 5 percent increase in their budget for an <u>additional research engineer</u>. **There is support from the Movielabs Board for the increase**, including me. No formal vote was taken. Movielabs budget for 2013 was 4.8M. Historically it has averaged 5.4M. they will be asking for slightly more than 5M. More than happy to discuss in more detail.
> Mitch Singer
> Chief Digital Strategy Officer, Sony Pictures

Sony fired Singer a few months later, in 2014. The "additional research engineer" is Weinstein's *other* hacking company *Electronics For Imaging* (**EFI**).[5]

---

[4] In 2019, Netflix joined the MPA, and 20th Century Fox left the MPA when it was purchased by Disney.

[5] Weinstein mentions EFI on his Stanford faculty page. EFI was located in Foster City, 2 miles from the Plaintiff's house (2011-17) in San Mateo. In Nov 2013, the Defs likely added EFI, to monitor the Plaintiff, because in Oct 2013 the Plaintiff sued Sony Pictures (an MPA member) & Neill Blomkamp (*Briggs v Blomkamp*).

Worse still, MovieLabs has imposed itself at the US Patent and Trademerk Office (**USPTO**). A PDF on the USPTO website, below, shows Raymond Drewry (MovieLabs' VP) listed as a panelist on its **Internet Policy** Task Force.

U.S. Department of Commerce Internet Policy Task Force

**facilitating the development of the online licensing environment for copyrighted works**

April 1, 2015, 8:30 am

**United States Patent and Trademark Office**
Global Intellectual Property Academy

Madison Building East, Second Level
600 Dulany Street
Singapore and Venice Rooms
Alexandria, Virginia 22313-1450

8:30 to 9:00          **Registration**

9:00 to 9:15          **Welcoming Remarks**

Shira Perlmutter, Chief Policy Officer and Director for International Affairs,
U.S. Patent and Trademark Office

9:15 to 9:45          **Standard Identifiers:  An Overview of the Current Landscape**

*Presenter:*  Mark Bide, Strategic Advisor, Copyright Hub

9:45 to 10:45          **The Challenges:  Gaps in Coverage and Areas for Improvement**

*Moderator:*  John Morris (National Telecommunications & Information Administration (NTIA))

*Panelists:*
Fred Beteille (Head of Product Content Strategy, YouTube)
Laura Dawson (Product Manager at ProQuest for Intota and ISNI)
Raymond Drewry (Vice President, Movielabs)

MovieLabs may have installed Drewry near the Patent Office to block American tech patents of technologies that the MPA, Microsoft, Google, Amazon might want to steal, and to encourage the Patent office to deny the Plaintiff's patent, should he try to patent his data aggregation concept (which dozens of corporations have since stolen: Palantir, MicroSoft, Amazon.com, Google…).

5

**Broad Implications**

This case is, first, a copyright infringement case. Secondarily, this case involves the Defs engaging in civil fraud and misrepresentation, to reinforce their infringement. Tertiarily, this case is about the Defs and their associates engaging in **criminal** internet fraud; but, as only proper authorities can bring criminal charges, it is for the District or This Court to review the evidence and make the referral.

After filing the Complaint, the Plaintiff continued his research into the Defs and their infringing associates (the **Infringers**), and reported his findings to the District, in declarations (**decl**), motions in limine, and requests for judicial notice.

As the Plaintiff researched, he found fraudulent copyright registrations (**regs**), related to several of his scripts, posted on the US Copyright Office[6] website. (See Plaintiff's 5th Mot In Limine, pp.15-20; Am. 2nd Decl, pp. 9-14.) [ER 52-53; 72-75] Thus, the Plaintiff investigated Register of Copyrights Karyn Temple, and learned Temple resigned from the Copyright Office, **Jan 2020,** and was quickly hired by the Motion Picture Association (MPA), owner of MovieLabs.  [ER 43-45]

The Plaintiff then investigated Librarian of Congress (**LOC**) **Carla Hayden** (the LOC has authority over the Copyright Office), and found Hayden listed on a talent website called "**A**ll**A**merican**E**ntertainment.com" (**AAEc**). The Plaintiff soon

---

[6] The Copyright Office's falsification of registrations includes falsifying documents for **foreign** countries, and giving the Defs an anachronistic registration ending in "44444" for their infringing film *Baby Driver* (mocking *Butterfly Driver*), to taunt the Plaintiff and mock his interest in the number 4. (Am. 2nd Decl.) [ER 72-73]

found **Eric Trump** (U.S. President <u>Donald Trump</u>'s son) listed on AAEc. AAEc is sponsored by Microsoft and Google, and also lists Bill Gates, Jeff Bezos, Larry Page, Peter Thiel, Reed Hastings, and many others, as clients. [ER 46, 59-62]

The Plaintiff soon found *All American Entertainment, Inc* (**AAE**), located in Florida, 29 miles from Trump's at Mar-a-Lago home. CorporationWiki.com indicates AAE received payments from 2 companies, *Imaging Equipment International Ltd* and *It - Innovation Technologies, Inc.*, which are owned by three (3) Ukrainian/Russians: Yury Mamtze, Vadim Grishchenko, and Robert Chmielinski. The evidence indicates the Infringers intend to actualize the Plaintiff's concept of military and policing prediction/prevention systems based on Plaintiff's concept of *aggregated data*—which was only included in the Plaintiff's Script (and published on TriggerStreet.com) between Dec 2006 and Jan 2007.

Much worse, the evidence suggests that the Infringers and Trump may have secretly agreed to sell private American data to Russia (see pp 44-45, herein, and ER 45-51). The participants in this scheme may have received payment through *All American Entertainment, Inc*.

Shortly after the Infringers learned about the Plaintiff's *data aggregation* concept, the Infingers arranged a technology convention, called "The Lobby", to be held in Hawaii, in October 2007. *The Lobby* participants may have agreed to collect data on Americans, for **Microsoft, Google** and **Amazon.com** to create

aggregated data-based systems to sell to US military and police agencies. Plaintiff researched the 140+ invitees to *The Lobby* and learned that only 2 or 3 of them were Black—and those 2 or 3 were reassigned or left their jobs before the *Lobby* event; thus, did not attend. The Plaintiff, who is Black (well, half black, half white) finds it significant that: (1) other than Carla Hayden, he found no Blacks listed on AllAmericanEntertainment.com; (2) "***All American***" is an 1980s and 1990s code for *White American*, used to discriminate against minorities in hiring and housing.

## STATEMENT OF JURISDICTION

The District had subject matter jurisdiction (infringement) per 28 USC § 1331. The District dismissed, Oct 16, 2020. *Notice of Appeal* was timely filed, Nov 12, 2020, per FRCP 4(a)(1)(A). This Court has jurisdiction, per 28 USC § 1291.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1. Copyrightable *expressions* need only possess a *minimal degree of creativity* (thus, simple photos, smiley faces, and *Snoopy*, are protectable). Hence, does the 9th imperil US liberty and global standing, by pretending, when film studios are involved, that copyright is too complex to understand, and contorting law to permit the corporate theft of actual persons' property? (An expression is a few ideas joined in a minimally creative new way.)

2. Whether "ideas are free" if their conceiver has not shared those ideas? Or, in the Ninth, are film companies free to hack and steal a person's life's work?

## STATEMENT OF THE CASE

A single idea, like a time machine, is not copyrightable. Thus, a *lightsaber* (a single idea) is not copyrightable. Yet, the Ninth has improperly protected uncopyrightable ideas, like lightsabers, for the film industry, for decades.

But the Plaintiff created one of most inventive screenplays in film history; but rather than protecting his claims, **the Order omits all of the Plaintiff's claims** (40+ pages and 13,000 words of unique and complex claims).

Subtextually, this suit is also about the 9th abnegating its duty to apply law evenly, by allowing almost any claim to pass extrinsic testing for film studios and corporate plaintiffs—AND properly reporting their claims; but setting an impossibly high extrinsic test bar for actual person plaintiffs—and omitting their claims from final orders; thereby, eliminating transparency and accountability.

The District Order seeks to discredit the Plaintiff, first, by mentioning his previous 3 infringement suits, then by falsely claiming the second and third suits are related to the first. Unthinkable. No court that understands what copyrights mean to prosperity would impugn a person for defending his/her copyrights. The District would never drag up a corporation's unrelated prior infringement suits.

Against the District's misstatements, the reason the Plaintiff was delayed in bringing this suit (and forthcoming suits) is found in the Complaint (p. *v*): [ER 19]

"...beginning around 2009, from time to time, Plaintiff's family and friends would describe films that sounded strikingly similar to his

9

screenplay (Butterfly Driver, AKA Uberopolis: City of Light ). Plaintiff assumed this was coincidental and did not inquire further.

26. March 15, 2018, Plaintiff received a voicemail from a woman named **Shirley Potash**, <u>a retired L.A. attorney in her 80s,</u> who had worked as a paralegal for years before becoming an attorney. [A biography about Ms Potash from Top Attorneys Of North America, is attached as **Exhibit A.**] Ms Potash said she had just read a legal article regarding the 9th Circuit's recent (unpublished) ruling against Plaintiff re Briggs v Blomkamp ( BvB ) 2013, and said she felt the Court had committed an injustice, and asked Plaintiff to return her call.

27. Plaintiff immediately returned her call. During the 20-30 minute talk, Ms Potash said that for years she worked for a law firm that represented many big L.A. film studios. She explained, "You know what I think? I think, not only did they [the Briggs v Blomkamp defs] read your screenplay, I think a lot of them [Hollywood professionals] read it." Plaintiff understood Ms Potash's heavy emphasis of the words "a lot" was her tactful way of informing him that through insiders she had heard that countless dozens of Hollywood insiders accessed his script. Thus, Plaintiff resolved to investigate what films Hollywood released after he began marketing his screenplay (early 2006)—starting with those films that his friends and family had described that sounded similar to his…"

Right: **Exhibit A** of the Complaint, **Shirley Potash.** [ER 29]

The accomplishments attained by Ms. Shirley Potash, in the field of Legal Services, warrants inclusion into the Top Attorneys of North America.

Shirley Potash concentrates in the



Thus, in 2018, <u>after Briggs v Blomkamp **languished** in appeal for **3 years**</u>, a few days after the 9th affirmed, **Shirley Potash**, an 89 year old LA attorney, called the Plaintiff and gave him a vote of confidence—and a tip (see above). Thus, the Plaintiff went back through his records, <u>and found the previously unknown access point</u>. But this, like virtually all of the facts, is omitted from the District Order.

## Copyright Infringement

Copyright Infringement requires showing: (1) Access; (2) Infringement.

**The Order does not challenge the Plaintiff's <u>access</u> claim.** Thus, it omits the disturbing details of how the Defendants accessed his script.

## Access

September 12, 2005, Def *Zero Gravity Management* (**ZGM**), a film talent agency, filed a California **certificate of cancellation**, and <u>went out of business</u>.

A few months later, Jan 20, 2006, after finding an online listing stating that ZGM was accepting scripts, the Plaintiff emailed ZGM (unaware that ZGM was out of business) and described two screenplays he thought ZGM might like to read.

ZGM responded that same day, and asked the Plaintiff to send his Script "City of Light" (***Uberopolis: City of Light***, which was later renamed ***Butterfly Driver***). ZGM's email did not say they were out of business, but it included <u>a contract, indicating they would contact the Plaintiff if they used his work</u>.

The Plaintiff sent ZGM his Script, that same day, January 20, 2006.

Six days later (Jan 26, 2006), ZGM filed a new California business statement, <u>and went back in business</u>. Late 2006, ZGM's owners (Mark Williams and Michael Pierce) opened a new business, ***Future Service Inc***, named on the first *Avatar* copyright registration (Dec 2006) and 12 other Avatar copyrights.

ZGM never contacted the Plaintiff again, after requesting his script.

In 2007, Def Twentieth Century Fox, <u>who produced Avatar and Taken</u>, made *Future Service Inc* its subsidiary, and NBCU made *Williams Productions LLC* (owned by Def Mark Williams) a subsidiary. In 2008, Def Michael Pierce opened *212 Fahrenheit Degrees Corporation*, which identifies <u>Google, Microsoft</u> and the **US Marines**[7] as clients. Thus, after accessing the Plaintiff's script, ZGM (Williams and Pierce) went from being out of business, to being: **(1)** subsidiaries of major corporations, **(2)** named on the copyright registrations of one of the most successful films ever (Avatar), **(3)** business partners with Google and the Marines.

### Misrepresentation & Breach Claims

Plaintiff filed *Intentional Misrepresentation* claims against ZGM for representing themselves as a valid business, when, in fact, they were out of business. Plaintiff filed *Breach* claims against ZGM for failing to contact him, as stated in ZGM's agreement. The Complaint also details the Defs' engagement in civil and <u>criminal</u> internet fraud, and presents 500 pages of evidence re these facts.

### Infringement Claims

Plaintiff's Infringement claims are presented in Arg #1. The basic facts are:

**(A)** The Complaint makes infringement claims against two Twentieth Century Fox films: *Avatar* and *Taken***.**

**(B)** The Complaint contains 40+ pages of detailed infringement claims.

---

[7] The evidence indicates that after ZGM accessed the Plaintiff's work, Pierce represented the Plaintiff's ideas as his own, and sold them to the military. [ER 66]

**Criminal Internet Fraud**

To infringe the Plaintiff's Script, the Defs released fraudulent and backdated web articles (primarily on archival sites) that claimed James Cameron wrote a script called "Project 880" in June 2005. The Defs later revised this story, to claim Project 880 was based on an "Avatar" *scriptment*, written in 1996.[8]

Internet Archive (**IA**) made verifiably fake *crawls* of these fake web articles, and Def Google LLC's *Chrome* browser displayed demonstrably false URLs of the fake IA crawls. The Plaintiff attached a video to the Complaint of how this fake crawl and URL scheme worked (see www.youtube.com/watch?v=b-j5SQ4_NHg).

In 2007 the Defs erased all of the Plaintiff's outgoing emails (2005-2007), and sent him numerous infected emails, in effort to erase all evidence of his Script.

Aug 7, 2020, Google LLC infected Plaintiff's computer with *NahimicService* spyware, by sending a Google Express email to his primary Gmail box.

The Defs used *Corporate Service Company* (**CSC**) to falsify their websites' *WHOIS* protocols. (Compl, pp. 42-46). As the Plaintiff wrote the Complaint, CSC erased the WHOIS protocol records of **sefilmclub.com**—the website that sent the Plaintiff a viral email in 2007.

---

[8] The first 10 Avatar copyrights are registered under the name *Project 880*. The Complaint explains the Defs likely initially guessed that the Plaintiff wrote his script in late 2005, but after learning that the Plaintiff emailed a draft of his script in May 2005, they changed their story (first, claiming Cameron wrote a script named *Project 880* in June 2005, then claiming *Project 880* was based on an *Avatar* script, written in 1996).

<u>Jan 14, 2020, the Plaintiff video-taped the Defs' hacking into his laptop</u> (attached to Complaint). (See https://www.youtube.com/watch?v=5pUX3T37iTY).

- <u>That same day</u>, Jan 14, 2020, **the <u>NSA</u>** announced a vulnerability in Chrome browsers, allowing hackers to send false URLs to targeted Chrome browsers.[9]

As Plaintiff wrote his Complaint (Aug 2019-Mar 2020), he noticed: **(1)** IA *crawls* of the Defs' fake articles change, indicating earlier initial crawl dates (this should never happen); **(2)** the CEOs of the infringing corporations began resigning (Larry Page, Sergey Brin, Bob Iger)[10]; **(3)** two of the Defs' businesses suddenly closed (Future Service Inc, Sept 2019; 212 Degrees Fahrenheit Corp, Jan 2020).[11]

**<u>Recusal</u>**. June 23, 2020, after 16 weeks on the case, without explanation, Hon Judge Orrick suddenly recused himself, and was immediately replaced by Hon Judge Chhabria, who "happened" to preside over Plaintiff's prior suits (*Briggs v Universal*; *Briggs v Spacey*). Chhabria was decried in the Complaint for his egregious 2018 *Briggs v Spacey* order (which Plaintiff contends Chhabria released on a **Saturday**, 3 days before Christmas, 2018, to suppress news of the case). The

---

[9] The NSA making this statement, just after Plaintiff video-taped the hacking, and just after Brin and Page resigned, suggests the NSA was monitoring Plaintiff.

[10] Mar 13, 2020, nine days after the Plaintiff filed his Complaint, Microsoft's founder, **Bill Gates** resigned from the Berkshire Hathaway board. And, although Gates has no college credential or qualifications, he began a 10-month TV talk-show tour, as a Covid-19 *expert*. This P.R. campaign was designed to bolster Gates' social image, to offset the tremendous reputational damage he might sustain if news of this suit leaked out.

[11] These events caused the Plaintiff to realize that the Defs were monitoring his online activity, via hacking.

Plaintiff immediately moved to disqualify Chhabria. Chhabria ignored this motion.

### Judge Chhabria Failed To Default The Defendants

Plaintiff moved to default Defs ZGM and Kamen, for failing to respond to service. The Clerk entered them into default. Judge Chhabria did not default them.

### Timeline of Key Early Events

1. Sept 2005, Zero Gravity Management (**ZGM**) goes out of business.

2. **<u>Jan 20, 2006</u>**, Plaintiff invites ZGM to read his Script, via email. ZGM permits Plaintiff to send his Script (same day); Plaintiff then sends Script (same day).

3. **Jan 26, 2006**, ZGM files a new CA business statement, back in business.

4. Feb 3, 2006, Ain't It Cool News publishes the Defs' first fraudulent article.

5. Mar 14, 2006, Dune Enertaintment II LLC, the first *Dune Entertainment* company is formed, owned by Stephen Mnuchin (US Sec of Treasury).

6. May 2, 2006, Virgin Galactic is formed.[12]

7. July 19, 2006, **MovieLabs** opens and names Steve Weinstein CEO.

8. Sept 20, 2006, ZGM and Margolis open FUTURE SERVICE INC.

9. Sept 29, 2006, Blue Origin is formed (backdated via Blue Operations' WA #).

10. Nov 30, 2006, Media Rights Capital is formed (producer of Elysium).

11. <u>Dec 2006 to Jan 2007</u>, Plaintiff releases (on TriggerStreet.com) a **re-write** of his Script featuring: **(1)** a virtual time machine (a digital Earth/Universe simulator)

---

[12] Def Michael Pierce became Richard Branson's business partner/associate.

policing system, based on **(2)** *data aggregation*, and **(3)** a mind/soul scanner.

12. 12/13/2006, Mark Williams (ZGM founder) forms *Williams Productions LLC*.

13. May 2, 2007, VentureBeat reports *the Lobby* convention to occur late 2007.

14. Oct 24-26, 2007, ***the Lobby*** occurs; over 140 luminaries attend (all 6 MPA

film studios, Jeff Bezos, Mark Zuckerberg, Sergey Brin, <u>Steve Weinstein</u>…).

15. <u>**Nov 6, 2007**</u>, <u>Facebook introduces "Beacon," its first data collection system</u>.

16. July 2008, Michal Pierce (ZGM founder) forms 212 Degrees Fahrenheit Corp.

17. December 2009, Avatar is released.

## SUMMARY OF THE ARGUMENT

The Appellant argues that the District Order/Judgment is improper because:

**1.** The Order follows the 9th's unlawful practice of setting a low bar for abstraction testing for *corporate plaintiffs*—and publishing corporate claims; but setting an inexplicable and impossibly high bar for *actual persons*—and <u>not</u> publishing their claims; **2.** The Order violates all *Skidmore v Led Zeppelin* precepts; **3.** The Order fails to assess the Plaintiff's selection and arrangement of unprotectable elements; **4.** Judge Chhabria improperly remained on the case, when duly disqualified.

## STANDARD OF REVIEW

**The District did not cite a basis for dismissal**. A dismissal without leave to amend is reviewed de novo. Dismissal for failure to state a claim pursuant to Rule 12(b)(6) is reviewed de novo.

# ARGUMENT

I. <u>Argument 1</u>: **The District's Infringement Ruling Is Improper Because:**
   **(A)** **It Relies On Gross Omission, Misapplications Of Law, And Follows The 9th's Practice Of Applying A Much Lower Abstraction Test Standard For Corporations & Film Industry Plaintiffs (And Publishing Corporate Plaintiff's Claims), But When The Plaintiffs Are Actual Persons vs Corporations, The 9th Applies An Impossibly High Abstraction Test Bar (And Does <u>Not Publish</u> Or Paraphrase The Claims); Eliminating Fairness, Transparency & Accountability.**
   **(B)** The Impropriety Of The Order Is Proven With *Twentieth Century-Fox v. MCA* (The Last Time The 9th Cited Claims Sufficient To Reverse).

   **A.** The Order omits **13,000 words** of the Plaintiff's infringement claims (see Compl pp. 59-95, and pp. 6-11—which also explain the historical significance of the Plaintiff's ideas) **and presents only 9 of the weakest words** of the Plaintiff's claims: "**the primacy of family**" and "**the horror of corporate greed**." [ER 12] The District Order omits any mention of multiple ground-breaking original aspects that the Defs infringed—<u>and multiple incidents of blatant scene infringement</u> (see pp. 23-26). This is against Copyright Law, which requires that the extrinsic test compare the **"articulable similarities"** (*Cavalier v. Random House*), which requires presenting and assessing a plaintiff's stated claims (or a reasonable paraphrasis). The District did the opposite, omitting 13,000 words; adhering to the 9th's history of holding corporations to a **low extrinsic standard** and <u>publishing their claims</u>, but holding actual person plaintiffs to an impossibly **high extrinsic standard** <u>and omitting their claims</u>; thereby, hiding the fact that the <u>Plaintiff's claims are magnitudes more original, complex and copyrightable than those</u>

claimed by George Lucas in *Twentieth Century-Fox v. MCA*.

## B. The Impropriety Of The District Order's Infringement Ruling Is Proven With *Twentieth Century-Fox v. MCA*

The Plaintiff's Script is unprecedented, in originality, scale and creativity. Yet, the District made no effort to protect his claims. **This is quickly proven** by comparing the Plaintiff's complex, creative claims to the almost comically simple claims cited in *Twentieth Century-Fox Film Corp. v. MCA, Inc.* 715 F.2d 1327 (9th Cir. 1983), the case in which Twentieth Century Fox claimed *Battlestar Galactica* infringed *Star Wars*, the only film industry infringement suit in which the 9th provided a list of claims illustrative of sufficient for reversal.[13] Upon remanding, the 9th provided the following 13 infringing aspects to support its reversal:

1. "The **central conflict** of each story is a war between the galaxy's democratic and totalitarian forces.
2. In Star Wars the young hero's father had been a leader of the democratic forces, and the present leader of the democratic forces is a father figure to the young hero. In Battlestar the young hero's father is a leader of the democratic forces.
3. The leader of the democratic forces is an older man, displaying great wisdom, and symbolizing goodness and leadership, with a mysterious mystical ability to dominate a leader of the totalitarian forces.
4. An entire planet, central to the existence of the democratic forces, is destroyed.
5. The heroine is imprisoned by the totalitarian forces.
6. A leading character returns to the family home to find it destroyed.
7. The search by the totalitarians and the liberation attempt by the democratic forces are **depicted in alternating sequences** between the

---

[13] In the past 43 year, the Ninth has only reversed three times in infringement cases against the Hollywood film industry; but in the other two other cases, the Ninth did not provide a list of claims to support the reversal.

totalitarian and democratic camps.

8. There is a romance between the hero's friend (the cynical fighter pilot) and the daughter of one of the leaders of the democratic forces.

9. **A friendly robot**, who aids the democratic forces is severely injured (Star Wars) or destroyed (Battlestar) by the totalitarian forces.

10. There is a scene in a cantina (Star Wars) or casino (Battlestar), in which musical entertainment is offered by bizarre, non-human creatures.

11. **Space vehicles**, although futuristic, are made to look used and old, contrary to the stereotypical sleek, new appearance of space age equipment.

12. The **climax** consists of an attack by the democratic fighter pilots on the totalitarian headquarters.

13. Each work **ends** with an awards ceremony in honor of the democratic heros."

Most of the 13 claims above (climax, conflict, scenes, events, shot sequence, characters) are very generic, <u>and outside of the 7 elements established in *Jason v. Fonda*</u> (9th, 1982): <u>plot, themes, dialogue, mood, setting, pace, and sequence.</u>

### The Plaintiff's Actual Claims

Now let us compare the simple claims presented in *Twentieth Century-Fox v. MCA* to the Plaintiff's claims. The following 13 pages (roughly 3200 words) are excerpted from the Complaint's 40+ pages (13,000 words) of infringement claims.

Pages 21-27 are excerpts of Plaintiff's infringement claims against **<u>Taken</u>**.

Pages 28-32 are excerpts of Plaintiff's infringement claims against **<u>Avatar</u>**.

The first section, p. 20 (from pp. 6-8 of the Complaint), has many omissions, to conserve space. This page is included to identify claims and <u>partially</u> explain the **historical significance** of some of the Plaintiff's original ideas. Plaintiff's claims begin on the following page. Most asterisks ("…") indicate omissions.

p.6 [Compl p. #]     ""**The Origins**

    69. In 2003… Plaintiff's son developed asthma… the Plaintiff wondered, "What about all the poor and immigrant kids in this community? What happens if they get very sick?

        **THE FIRST ORIGINAL & REVOLUTIONARY EXPRESSION**
        **A Sci-Fi Hero With A Simple, Common, Family-Centric Goal**

    70. … sci-fi always felt emotionally remote, as it usually involved some tough guy in shoulder pads, who was almost always single, no kids, and whose goal was ALWAYS, ALWAYS, ALWAYS something that no contemporary person has ever had to do. Consider:

    1. In The Matrix, Neo must master amazing combat skills to save….

    2. In Blade Runner, Deckard must catch and kill a bunch of escaped....

    3. In Star Wars, Luke Skywalker must learn to use the Force to stop....

p.7    4. In Star Trek, Jim Kirk and his crew must explore strange new….

    72. Plaintiff thought, "I'm going to write the first sci-fi film where the hero has a simple, family-centric goal: fighting for the life of a family member!" Plaintiff's screenplay would be about a father, in a brutally divided future Earth, who would go to any lengths, face any odds or any opponent, to save his daughter's life.

    73. This idea... had never been done before, in all of sci-fi history.

        **THE SECOND ORIGINAL & REVOLUTIONARY IDEA**
    **Plaintiff Heavily Infused Modern Politics On A Sci-Fi/Action Canvas**

    74. Before 2008, the rules of science fiction film (and action, adventure, thriller and horror film)... Back then, dealing with hard politics and social issues was still strictly reserved for drama and comedy genres...

    75. Sci-fi (film) before 2008, avoided politics in favor of good-vs-evil stories… ALWAYS, before 2007…writers ALWAYS imagined worlds where the politics are very different from our contemporary politics:

    1. Children of Men (book) imagines a future where male sperm.....

p.8    2. Logan's Run (book): When the world is overrun by the young,....

    3. Planet of the Apes (book, " La Planète des singes ,".....

    76. These socio-political structures have nothing to do with our contemporary lives.

    77. ....against every convention Plaintiff took a panoply of our most divisive social and political issues and imposed them on a sci-fi canvas, where people struggle with the same political and social issues they struggle with today. Second, Plaintiff AMPLIFIED these issues....

        Why AMPLIFY The Problems?

    78. Plaintiff amplified the issues/politics because it informed the viewer that if we address these issues now, we can avoid a horrific future.""...

## PLAINTIFF'S INFRINGEMENT CLAIMS AGAINST <u>TAKEN</u>:

p.85                              ""PLOT

455. The Plaintiff believes that the overarching central plot of Uberopolis: City of Light is the first of its kind . Since the Defendants accessed the Plaintiff's work, numerous films have copied the Plaintiff's unique central overarching plot structure….

### Basic PLOT of Butterfly Driver

456. Butterfly Driver is about the impossible lengths and desperate measures a poor former US soldier and patriot will take to save his daughter, with only one week to do it.

### Basic PLOT of Taken

457. Taken is about the impossible lengths and desperate measures that a poor former US soldier will take to save his daughter, with only 96 hours to do it.

p.86                              HERO

458. Plaintiff created a very unique hero (especially at the time, 2005). Unlike the typical action adventure hero, who, at the time, were childless, had unlimited money, womanized, lived in expensive apartments or houses, and never seem to work; Arlo was the opposite: a devoted father, poor, working all the time, living below his family in a small sparsely decorated studio in a garage. Taken infringes on all of these unique attributes, and more:

| Butterfly Driver / Uberopolis | Taken |
|---|---|
| ● Arlo Grainer is a former U.S. soldier & war hero. | ● Brian Mills is a former U.S. military special forces hero; possibly ex-CIA. |
| ● Arlo's age is 45. | ● Brian appears 45-50. |
| ● Arlo is a devoted father. | ● Brian is a devoted father. |
| ● Arlo is a poor man. | ● Brian is a poor man. |
| ● Arlo lives alone. | ● Brian lives alone. |
| ● Arlo is separated. | ● Brian is divorced. |
| ● Although separated, because Arlo is committed to his kids, he lives downstairs in a converted garage. | ● Although divorced, because Brian is committed to his daughter, he lives nearby, in a small apartment. |
| ● Although very masculine, Arlo does not have a girlfriend, as he is focused on his kids and being a good father. | ● Although very masculine, Brian does not have a girlfriend, as he is focused on his daughter and being a good father. |
| ● Arlo thinks clearly under pressure, is a great fighter, but | ● Brian thinks clearly under pressure, is a great fighter who fights |

21

| | |
|---|---|
| avoids combat unless necessary.<br>● Arlo has military connections that help him repeatedly (1. Dr. Laney Schuler treats Franny; 2. Arlo's military and ZR friends get him into Uberopolis). | whenever possible.<br>● Brian has military connections that help him repeatedly (1. military connections gets Brian to Paris in a private jet; 2. said connections help find bad guys). |

p.87 **POOR HERO**
**Butterfly Driver / Uberopolis**

459. Plaintiff chose to make his hero poor, which, at the time, was very uncommon. Plaintiff did so because he wanted to promulgate new, accurate and nobel portrayals of the poor.

**Taken**

460. The Defendants infringed on Plaintiff's "poor hero" concept. The Defendants show (and say) that their hero is poor in a several ways, including:

1. In the beginning of the film Brian buys his daughter an inexpensive karaoke machine for her birthday. The owner of the store comments that Brian has come to the shop many times to see that machine (suggesting that Brian lacks the resources to make purchases that most middle-class Americans can make….

2. In a phone conversation with his daughter Kim's kidnappers, Brian tells the kidnappers that he does not have any money, but if they do not let Kim go immediately, he will kill all of them.

**HERO IS ALWAYS WORKING & JOB DESTROYS MARRIAGE**
**Butterfly Driver / Uberopolis**

461. The Plaintiff created a hero, Arlo, who was always working. From the beginning of the script to the end. In Uberopolis: City of Light (Ex O6, page 63) a warrior woman is attracted to Arlo and asks if Arlo is happily married, and Arlo succinctly explains his dangerous job (line riding) hurt his marriage.

TINA

I guess your wife must be very happy.

ARLO

Maybe a long time ago -before I started line riding.

**Taken**

462. Taken borrows this structure. Near the end of the film, Brian's ex-wife explains she worried for years about Brian's long absences and worried if he would make it home alive.

p.88 **HERO LIVES NEAR HIS SEPARATED FAMILY**

**Butterfly Driver / Uberopolis**

463. The Plaintiff 's hero is separated from his wife, but lives nearby in a small converted studio, in one half of the downstairs garage.

**Taken**

464. Taken borrows this, in the first act, at a barbeque, Brian's friend asks of Brian's ex-wife, "Does she appreciate the fact that you've given up your life to be closer to her?"

**HERO USES HIS PHONE AND GPS TO OUTSMART
& MISLEAD PURSUING STATE FORCES,
AND USES A SECOND PHONE TO MONITOR THEM**

**Butterfly Driver / Uberopolis**

465. When Arlo learns that State bounty hunters are in his zone looking for him, he races home to gather his family, but before leaving, Arlo booby-traps the house. Then, knowing that State bounty hunters are following the GPS (Global Positioning System) signal in his phone (omni-com), Arlo places his phone, with the video recorder "on," in the pocket of a jacket on a coat-rack, then places the coat-rack in front of a window in the house—so that in the silhouette of the streetlight, the coat-rack appears like a man hiding behind the window. Arlo flees with his family. A bit later, Arlo calls his phone from his wife's phone, and watches the video feed from his phone, and sees his booby trap kill the bounty hunters. [See Ex X4, pp 11-13].

**Taken**

466. Taken borrows Plaintiff's screenplay's exact structure.

467. Wary about a meeting with his old friend, Jean-Claude Pitrel, and knowing that when he calls Pitrel, the French special police will be able to track his position (using GPS), Brian places his phone on top a building near a park, with a walkie-talkie attached, then calls Pitrel from another roof-top. When Brian calls Pitrel, Pitrel's men descend on Brian's phone, only to find his phone connected to a walkie-talkie, and Brian gone, as Brian watches from afar...

p.89      **HERO INFILTRATES BY DRESSING UP
AND PRETENDING TO BE A COP**

**Butterfly Driver / Uberopolis**

470. On the satellite city Uberopolis, Arlo steals a police uniform from an unconscious police officer, then infiltrates Uberopolis' hospital by pretending to be a police officer.

**Taken**

471. Brian dresses in a police officer's uniform, and pretends to be a police officer, to infiltrate the lair of the bad gang...

23

## HERO TRICKS HIS OLD FRIEND (AN EXPERIENCED STATE INVESTIGATOR) TO BELIEVE THAT HIS GUN IS UNLOADED
### Butterfly Driver / Uberopolis

472. Jerry, Arlo's old friend from the military, now works for the government as a special investigator, but hates his job. Midway through the story, Jerry agrees to apprehend Arlo. When Arlo and Jerry finally come into direct contact, Arlo pulls a gun on Jerry and order's Jerry to give him his gun. Jerry complies, then suddenly punches Arlo, and a fight ensues. The fight culminates with Jerry and Arlo mixing up their guns, and Jerry holding a gun on Arlo, and Arlo holding a gun on Jerry. Arlo gets the upperhand by informing Jerry that Jerry is holding Arlo's gun and it is not loaded , then points Jerry's gun at Jerry and instructs Jerry to give him the gun, and get in the back of the sky-car trunk. Jerry complies.

### Taken

473. Jean-Claude Pitrel, Brian's old friend from the military, now works for the French government as a special investigator, but hates his job. Midway through the film, Pitrel agrees to apprehend Brian, to stop him from wreaking further havoc on Paris. When Pitrel gets home from work, he finds his wife has already allowed Brian into Pitrel's house. Pitrel excuses himself to the bathroom, where he gets his gun. When Pitrel returns to the table, he pulls his gun on Brian. Brian informs Pitrel that his gun is unloaded , and drops Pitrel's bullets on the table. (Brian craftily went to the bathroom, earlier, and unloaded Pitrel's gun.)

p.90 ### PARANOID HERO
### Butterfly Driver / Uberopolis

475. Arlo is always on guard, from years of living in a war zone. When unexpectedly startled, he puts his gun in a peaceful guru's face. [See Ex X6, page 58.] The guru explains:

GURU

Surviving the war and fourteen years underground requires some healthy paranoia . But you're safe here.

476. Benni is very bothered that Arlo could put a gun in a peaceful Guru's face. As this dialogue progresses (Ex X4, page 60) Arlo explains that his fears keep him aware, saying:

ARLO

Fearless? I got fears. They keep me smart... on my toes.

### Taken

477. Taken infringes on this same paranoid characteristic, as Brian drives his daughter Kim to the airport, they have the following exchange:

KIM

24

"Mom says your job makes you paranoid."

BRIAN

My job makes me aware.

## HERO STEALS MULTIPLE VEHICLES, HAS MANY VEHICLE CHASES, CAUSES ACCIDENTS, BREAKS INTO VEHICLES, CAUSES EXPLOSIONS

### Butterfly Driver / Uberopolis

478. Arlo engages in 7 high speed vehicle chases. Arlo steals 4 vehicles: 2 space shuttle-trains (Ex X6 pp 32-33, 110-111), 1 police sky ranger (p85), 1 police sky cycle (p101). Arlo also breaks into Jerry's car. And Arlo causes multiple vehicle crashes and several explosions .

### Taken

479. Brian engages in multiple car chases, steals multiple vehicles, causes many vehicle crashes, causes several explosions, and breaks into one...

p.91    **HERO CAUSES VILLAIN & ANCILLARY CHARACTERS TO WORRY ABOUT THE DESTRUCTION THE HERO MIGHT DO TO THE CITY**

### Butterfly Driver / Uberopolis

482. The Plaintiff had secondary character(s) comment on Arlo's capacity for destruction, if provoked. For instance (See Exhibit T6, page 70, Uber), when Howard Mann learns that Arlo is going to the satellite city of Uberopolis, he comments:

HOWARD MANN

Shit. That's throwing a match in a powder keg.

### Taken

483. Taken misappropriates this story structure and has secondary character(s) comment on Brian's capacity for destruction, Jean-Claude Pitrel tells Brian:

JEAN-CLAUDE PITREL

Brian, you cannot just run around tearing up Paris.

## HERO RIDES IN CAR (VEHICLE) WITH HIS CHILD, WHILE HIS CHILD INQUIRES ABOUT THE HERO'S DANGEROUS JOB

### Butterfly Driver / Uberopolis

484. In the first act of Uberopolis, as Arlo rides with his teenage son, John Carl, his son asks Arlo about his dangerous job. (See Exhibit U6...

JOHN CARL: Why do they call it line-riding, anyway?

ARLO: The U.W.N.'s radar shield is 200 feet above ground level. To avoid being shot down we have to ride below that line.

JOHN CARL: Hmm. So, when are you gonna take me on a run with you?

ARLO: Never. I wish you'd get that idea out of your head. We...

25

**Taken**

485. Taken infringes this story/character structure: As Brian drives his daughter Kim to the airport, Kim explains that when she was younger, she asked her mother about Brian's job, but her mother told Kim to ask her father (Brian). Kim explains she was always too afraid to ask. Brian explains that he's a preventer; he prevents bad things from happening.

p.92 **HERO'S DAUGHTER**

486. In Butterfly Driver/Uberopolis Arlo Grainer will go around the world, and up into Space, to the super satellite for the super-rich, Uberopolis (where Arlo becomes a one-man wrecking ball), all to save his daughter.

487. Similarly, Brian Mills will go halfway around the world for his daughter, and become a one man wrecking ball; which may in itself be copyrightable. But 20CFOX, Besson and Kamen went further than that. Defs' "Daughter" Infringes The Spirit Of Plaintiff's Daughter….

488. The Plaintiff's character, Franny is a seven year old girl. The Plaintiff chose that age because he felt that it would soften the hearts of most…

489. Although Taken's daughter character, Kim, is 17 years old, the film opens with a few minutes of old "family video tape footage" of "Kimmy" at her fifth birthday, then returns to this footage again, later. The film also repeatedly returns to scenes where the hero, Brian, is at home looking at photo albums of Kim when she was a little girl. This is the Defendants' desperate effort to infringe on the Plaintiff's story….

p.93 **CENTRAL THEMES**

**(1) Central Theme: The Primacy Of Family**

491. The primacy of family is a central theme of the Plaintiff's work and the infringing film Taken.

**(2) Central Theme: The Virtue Of Character**

492. The Plaintiff's work and Taken both feature unusual heroes who are uniquely good and responsible men, who are poor, live simply, do not womanize, and do not compromise.

**(3) Central Theme: Immigration**

493. Immigration was a very central theme in Plaintiff's work. At the time, 2005-2006, immigration was a very uncommon subject for a mainstream action-adventure or sci-fi films. The Plaintiff wrote about immigration in a loving, understanding way, as he took a proud former American family (the screenplay takes place about 14 years after the downfall of America) and forces this proud American family to immigrate into the wealthy and powerful "State" to survive.

494. Of course, the Defs took this immigration theme….

p.94 **Unhappy Government Worker Who: (1) Complains**

26

**About Job, (2) Is An Old Military Friend Of The Hero,**
**(3) Tracks The Hero, (4) Loses An Empty Gun To The**
**Hero, (5) Tries To Talk The Hero Into Surrendering...**

496. **Butterfly Driver** features a unique central character, who knows the hero from their past in the military. This character's collective characteristics are: 1. Jerry is an old friend of the hero; 2. Jerry served in the military with the hero; 3. Jerry is very unhappy in his government job and complains about his job; 4. Jerry has a son that he is very close to; 5. Jerry is seen reading to his son in his son's room; 6. Jerry is happily married; 7. Jerry negotiates with his superiors before agreeing to apprehend the hero; 8. Jerry tries to get the hero to surrender and turn himself in; 9. Jerry gives significant assistance to the hero at one point in the story (the ending); 10. Jerry pulls a gun on the hero, but hero gets away by telling Jerry his gun is unloaded. 11. Jerry refers to the government as " The State ".

**Taken**

1. Pitrel is an old friend of the hero; 2. Pitrel served in the military with the hero; 3. Pitrel is very unhappy in his government job and complains about his job; 4. Pitrel has children that he is very close to; 5. Pitrel is seen reading to his children in their room; 6. Pitrel is happily married; 7. Pitrel negotiates with his superiors before agreeing to apprehend the hero. 8. Pitrel tries to get the hero to surrender and turn himself in; 9. Pitrel gives significant assistance to the hero at one point in the story (the beginning); 10. Pitrel pulls a gun on the hero but the hero has already unloaded Pitrol's gun; 11. Pitrel refers to the government as " The State ".

p.95
**"THE STATE"**
Butterfly Driver / Uberopolis

697. In Plaintiff's screenplay, all characters refer to the new Unified World Government as " The State ". ....

JEAN-CLAUDE PITREL

"You can't beat The State , Brian! You know that!"

BRIAN MILLS

"I'm not trying to beat The State ! I'm trying to save
my daughter!"

**TIME LIMIT**
Butterfly Driver / Uberopolis

500. To add a layer of urgency, Plaintiff gave Arlo a week (7 days) to save his daughter.

Taken

501. Taken borrows this element, and gave Brian 96 hours (4 days) to find his daughter.""

27

## PLAINTIFF'S INFRINGEMENT CLAIMS AGAINST <u>AVATAR</u>





**Butterfly Driver / Uberopolis**          **Avatar**

<u>Plaintiff's claims against **Avatar** are much different from his claims against</u>

<u>Taken</u>. The following claims were taken from the Complaint, and contain ample

omissions (usually noted with asterisk "...") to conserve space.

|  |  |
|---|---|
| p.61 [Compl p. #] | ""**THE DEFS INFRINGE / MISAPPROPRIATE**<br>**PLAINTIFF"S THEMES** |

343. The Defs' Avatar film misappropriates Plaintiff's collection of themes. These are:
  1. The primacy of family.
  2. The importance of respecting and protecting the environment.
  3. The importance of living in union with God and nature.
  4. The horror of corporate greed.
  5. The importance of adequate healthcare.
  6. The cruelty, brutality and senselessness of classism and racism.
  7. The content and quality of one's dreams, reflects one's connection to God and nature.

p.62                           **2. THE HERO**

344. Plaintiff claims the following collection of central characters, story structures, and thematic arrangements are the Plaintiff's unique copyright protected property, as expressed in his screenplay Butterfly Driver (previously titled Uberopolis: City of Light ). **The Defs' film, Avatar, infringes on each of these characters, story structures, and thematic arrangements.**

THE HERO

345. Plaintiff's hero is (1) is a former US soldier hero; (2) is disabled; (3) is poor; (4) is motivated by both a healthcare goal and an environmentalist goal; (5) is a visionary dreamer; (6) is connected to God and spirituality; (7) has a close connection to animals that reveals his goodness; (8) lives in a dystopian, overpopulated future Earth, where crime is rampant and humans are destroying the environment.

28

p.64 **3. DEFENDANTS' INFRINGEMENT OF PLAINTIFF'S**
**UNIQUE NEW CONCEPTUAL TECHNOLOGY:**
**MIND-SOUL SCANNER, REPLICATOR & TRANSFERER**

347. The Plaintiff's screenplay, Butterfly Driver , features a conceptual technology that had never been conceived or used in film or literature history. This technology is an expression , in itself, because it involves a number of moving parts. This central technology is an electronic based full brain, body and soul scanner (or scan; noun or verb), that scans all of the mental and biological information a person, and makes perfect digital reproductions of them (particularly their brains and/or souls). These digital mind/soul copies are then used for one of three purposes: (1) they are entered into a State computer system where the State can reproduce these digital people (who believe they are alive), then use them to deceive actual citizens in a number of ways [See Exhibit X6 , page 37, 38, the character Lespi has been killed, but is digitized in a virtual world, and thinks he is still alive]; (2) these mind/soul scans can also be placed in new physical bodies;....

**Defs Infringement Of Plaintiff's**
**Mind/Soul Scan/Replicator/Transferer**

350. The Defendants infringed on Plaintiff's technology/concept by having Jake's mind/soul scanned and replicated and transferred into Jake's Avatar's empty mind.

p.72 **10. CLIMAX / CRISIS:**
Hero Is Defeated By Villain, Then Saved By
The Secondary Hero, The Secondary Hero Defeats The Villain,
Hero's Disability Almost Kills The Hero

p.73

394. All of the following aspects are infringed on by the Defendants' Avatar:

1. The hero fights valiantly but the hero's disability creates an opportunity for the villain to gain the upperhand; thus, the hero is defeated by the villain.
2. The villain seems sure to kill the hero (this is the first climax crisis);
3. The secondary hero saves the hero;
4. The secondary hero kills the villain;
5. The hero(s) are not out of trouble yet; once again, the hero seems sure to die (the second climax crisis).

p.74-75 **11. CLIMAX**

Plaintiff's climax involves at least three elements (infringed on by the Defendants): 1. Violence; 2. God and spirituality; 3. Animals. These

elements' specific structures might described as follows:

1. In the climax of the Plaintiff's work, the villain and hero engage in a hand-to-hand fight, involving violent strikes (blows) and gunfire.
2. The climax of the Plaintiff's work includes an event that appears to be divine intervention (a meaningful dream about a dolphin).
3. The climax includes an animal (a dolphin) that saves the hero from drowning. Later, in the climax, as the hero seems doomed, a dream about the dolphin, saves his like.

### Avatar

401. Avatar's climax borrows this unusual combination of climax elements (violence, God and spirituality, animals), as follows:

1. In the climax of Avatar, the villain and hero engage in a hand-to-hand fight, involving violent strikes (blows) and gunfire (or knife-gun fire).
2. The climax of Avatar includes an event that appears to be divine intervention—when animals join the battle.
3. Avatar's climax does not resolve until the planet's animals join the fight.

p.77  **14. PANOPLY OF SOCIAL & POLITICAL ISSUES**

410. Plaintiff's screenplay appears to be the first science fiction or action or adventure or thriller in American film history to buck the hollywood rule of avoiding addressing hard, real and divisive political issues, AND to buck the convention of avoiding addressing hard, real and divisive social issues. Rather, the Plaintiff not only addressed hard and divisive socio-political issues, he addressed MANY of them . But the Plaintiff went even further: he amplified these issues , meaning he actually made them worse….

413. The Defs' **Avatar infringes on the Plaintiff's use of a panoply of socio-political issues** (and uses the very same issues), and **amplifies** and weaves them into the story.

p.79  **16. CENTRAL CHARACTER**:
**Good-hearted Female-Atheist-Scientist Who Is Killed**
**Butterfly Driver**

420. Butterfly Driver features a heroic scientist named Tamara Gwynn, who (with her deceased father's help) has invented a new technology that can help save mankind from the toxic environment. Tamara assure's Arlo that she is a scientist who does not believe in God, in a central exchange (Ex X6, page 15) when Tamara asks Arlo if he is religious:

TAMARA: ...So you're religious?

ARLO: Nah. Maybe there's a God though… You religious?

TAMARA: Faith comes from our unreasonable hopeful nature. That's how we survive. I put my unreasonable hopes in my A-cell."

421. In the end, although Tamara's heart was heroic and good, she dies.

## Avatar

422. After Grace Augustine (a central character who is a heroic scientist) is shot by Quaritch, Jake realizes her wounds are life threatening and beyond conventional medicine. As they race above Pandora, in a helicopter, Jake informs Grace that he is going to take her to the Na'vi so they can heal her with their faith based treatment. That dialogue reads:

JAKE: I'm gonna get you some help Grace.

GRACE: I'm a scientist, remember? I don't believe in fairytales.

423. When Grace arrives to the Na'vi and the Tree of Souls, she is a bit more hopeful that the Na'vi's intervention might save her. But in the end, her body is too weak, and she dies.

p.79
## 17. MOOD

424. The mood of the contested works is identical: very dark, with a hopeful ending

## 18. GENRE

425. Both works are future-set (2144 and 2154), reality-based, dark, ecofiction (environment oriented) science fiction. The genre is identical.

## 19. VITAL NEW ENERGY SOURCE

426. Both works involve a vital new energy source that can improve the lives of people on Earth. In Butterfly Driver, the new energy source is Tamara Gwynn's A-cells. In Avatar the energy source is unobtainium, found on Pandora.

p80
## 20. EARNING A SOUL

427. As shown in the prior section "Spirituality & God" Arlo says "I probably don't know what a soul-mate is. But I bet not everyone earns a soul in this life " [See Exhibit O6 , p 63, line 9.] This statement implies Arlo believes that we all have to earn , or cultivate, a soul if we are to exist in the hereafter.

428. There may be other thinkers in the annals of human thought who also conjured the idea of earning a soul, but it had never been expressed in film or screenplay.

429. Yet, once again, of course, Avatar infringes on the Plaintiff's concept of earning something bigger than one's original existence. As

Jake becomes closer to the Na'vi he says: "The Na'vi say every person is born twice. The second time is when you earn your place among the people forever ." This is precisely earning a soul —as most believers believe the soul is the part of us that lives forever . Jake is talking about earning a place in Avatar's Tree of Souls . This is earning a soul.

p.82                                   **23. PLOT**

440. Virtually every plot structure, every expression, every idea and element of Avatar came from Plaintiff's work. The Defs also have stolen much of Plaintiff's overarching plot.

Plaintiff's Overarching Plot

441. Butterfly Driver's overarching plot might read: " Unable to afford a medical procedure to save his daughter from Earth's polluted atmosphere, a poor former US soldier (Arlo) who is also disabled (suffering ice-pick headaches ) will go to impossible lengths for the love of his daughter —and in the process he may save Earth's environmental biosystem — if the corrupt corporate government doesn't stop him first. "

Defendant's (Avatar) Overarching Plot

442. Avatar's overarching plot might read: " Unable to afford the medical procedure that might repair his spine, a poor former US soldier (Jake), who is also disabled (parapalegic), agrees to be part of a mining mission to a distant planet called Pandora , where he falls in love with an alien. But when the humans and aliens come into conflict, Jake will go to impossible lengths for his new love —and may save Pandora's environmental biosystem — if the corrupt corporate mining company doesn't stop him first." """

## Infringement Claims Summary

The preceding 13 pages show that the District Order willfully omitted and mischaracterized the Plaintiff's claims, and failed to afford them due protection.

This bias against the Plaintiff is improper and against *Skidmore v Led Zeppelin:*

> "But nothing in copyright law suggests that a work deserves stronger legal protection simply because it is more popular or owned by better-funded rights holders."

**II.**   **ARGUMENT #2: The District Erred By Not Holding The Parent Corporation(s) (News Corp, 20CFOX) Liable For ZGM's (And Future Service Inc's) Misrepresentations & Breaches.**

The District's Order improperly states: [ER 13, 14]

Briggs **does** allege that he had communications with ZGM, such as when he submitted Butterfly Driver to the agency, but he does not **clearly** allege that pertinent representations from the other defendants were made to him.

This is false. The Complaint's *Claims For Relief* properly plead *Breach* and *Misrepresentations* claims against News Corp, Twentieth Century Fox (**20CFOX**), et al.  Pages 15-17 of the Complaint provide the bases for the *Misrepresentation* and *Breach* claims. Pages 18-23 show: **(1)** after ZGM accessed the Script they formed many companies, including *Future Service Inc* (**FSI**), who is named on the Avatar copyright regs, and who became a subsidiary of Def News Corp (**NC**);[14] **(2)** These 4-5 entities used the same residential address, but used the names of different owners—who did not live at that address (business fraud), [ER 20-22] **(**thus, the new entities were a subterfuge for illegal transactions); **(3)** Sept 27, 2019, after **13** years, as Plaintiff composed his Complaint, FSI went out of business.

The Complaint explains that Defs NC and 20CFOX are named in the Misrepresentation claims because they were aware of ZGM's unlawful actions; thus, as **parent**, they were liable for the subsidiaries (ZGM, FSI). California allows courts to **pierce the corporate veil** (hold parents responsible) if a corporation **(1)** is

---

[14] The Plaintiff's Second Decl shows that Rupert Murdoch and News Corporation first hacked into Plaintiff's computer in 1999.

a subterfuge of illegal transactions, **(2)** is used to procure labor, services or merchandise for another entity. News Corp acquired FSI to procure the Plaintiff's ideas (via ZGM), satisfying bases to "pierce the veil."

### Proof of The Defs Unlawfully Using Subsidiaries To Procure Labor/Services, And As Subterfuge of Illegal Transaction

The email on page 4, herein, shows that MovieLabs was not an independent corporate entity which earned money from producing independent goods and services. Rather, the MPA installed one officer, "board member" (**BM**), from each of its 6 major studios at MovieLabs. These MovieLabs BMs then report directly to their corporate <u>legal teams</u>. Thus, in the email (p. 4), we see MovieLabs BM, Mitch Singer, email Sony Pictures' <u>General Counsel</u> and Executive VP, Leah Weil, and remind Weil of "**the importance of many of their** [MovieLabs] **projects to the industry**." Then Singer asks Weil for "**a 5 percent increase in their budget for an additional research engineer**." MovieLabs is clearly asking the parent (Sony Pictures) for money—not for a purchase that Sony made from the subsidiary, but <u>for MovieLabs' entire annual budget</u>, to <u>procure labor and service</u>. This is unlawful, and shows MovieLabs is a subterfuge for illegal transactions.

The District had Good Cause to hold Def News Corporation and 20CFOX liable for ZGM's (and FSI's) Misrepresentations & Breaches. The District's refusal to do so was an error and an abuse of power. Therefore, the District's Order/Judgment is improper.

III.     <u>**ARGUMENT #3:**</u> **The District Order Is Improper Because:**
     **(A)**     **The District Failed To Assess & Protect The Plaintiff's Unique Selection And Arrangement Of Unprotectable Elements;**
     **(B)**     **The District Failed To Provide The Plaintiff An Opportunity For Expert Testimony, Per Skidmore v Led Zeppelin.**

**A.**    Page 23 of *Skidmore v Led Zeppelin* states:

> A finding of such similarity may be based on the overlap of <u>unprotectable</u> as well as <u>protectable</u> elements. *Rentmeester*, 883 F.3d at 1117.

Because discretionary dismissals are not highly favored at the pleading stage, the District had a duty to adhere to procedure. The District did not.

The Plaintiff invoked his ***selection and arrangement*** of unprotectable elements argument in his ***Claims For Relief***: [ER 28]

> "606. Like all works, Plaintiff work contained **unprotectable elements** which had been done before. But Plaintiff's various unique arrangements of **unprotectable elements**, like other such works, are protectible. The Defendants infringed on these unique expressions."

As these claims are in the Plaintiff's *Claims For Relief*, the District had a duty to request Plaintiff's selection and arrangement ***theory***, per *Skidmore,* p. 43:

> The fatal flaw in Skidmore's argument that he was entitled to a selection and arrangement instruction is that he did not present that as a separate theory at trial. To be sure, a copyright plaintiff may argue "infringement . . . based on original selection and arrangement of unprotected elements." *Metcalf*, 294 F.3d at 1074 (quoting *Apple Computer*, 35 F.3d at 1446). The supposed centrality of a selection and arrangement theory is belied by the trial record. **Skidmore never once used the words "selection"** <u>**or**</u> **"arrangement" during trial.**

Unlike Skidmore, the Plaintiff repeatedly made this argument. *Skidmore v Led Zeppelin* stresses that invoking this claim commands certain responses (p. 47):

"Ultimately, failure to properly invoke a selection and arrangement argument is a death knell for Skidmore's request for a selection and arrangement instruction."

The District erred in not requesting Plaintiff's selection & arrangement theory.

### (B) The District Failed To Allow Expert Testimony

To dismiss, at the pleading stage, which is not favored in infringement cases,

a court must do an extrinsic test, requiring dissection <u>and</u> expert testimony. But the

District did not give the Plaintiff a chance to provide expert testimony, per *Krofft*:

"It is extrinsic because it depends not on the responses of the trier of fact, but on specific criteria which can be listed and analyzed. Such criteria include the type of artwork involved, the materials used, the subject matter, and the setting for the subject. Since it is an extrinsic test, analytic dissection **and expert testimony** are appropriate."

Hence, the District's Order/Judgment is improper.

**IV.**     <u>**ARGUMENT #4**</u>**: The District's Order Is Improper Because It Biasedly Misrepresents ALL Facts, Violates Copyright Precepts & Violates *Skidmore v Led Zeppelin*.**

The Order is improper because the District biasedly misapplied law and

made misrepresentations, against the Plaintiff. The Order's first paragraph states:

"**This is the latest in a series of lawsuits** by pro se plaintiff Steve Wilson Briggs against Hollywood figures, alleging conspiracies relating to the theft of his screenplay, Butterfly Driver. See, e.g., Briggs v. Blomkamp, 70 F. Supp. 3d 1155 (N.D. Cal. 2014), affirmed as Briggs v. Sony Pictures Entertainment, Inc., 714 F. App'x 712 (9th Cir. 2018); Briggs v. Universal Pictures, et al., No. 3:17-cv-6552-VC (N.D. Cal. Apr. 25, 2017); and Briggs v. Spacey, et al., No. 3:18-cv4952-VC (N.D. Cal. Dec. 22, 2018), affirmed, 793 F. App'x 634 (9th Cir. 2020). In the first lawsuit, Briggs sued Neil Blomkamp, among others, alleging that the film Elysium

36

infringed Butterfly Driver. **In the second, he again alleged that Elysium infringed Butterfly Driver**, but added some new defendants, including Kevin Spacey, Matt Damon, and Ben Affleck. **In the third lawsuit, Briggs made similar claims about Elysium and Butterfly Driver**…."

This paragraph is false and improper. _Briggs v Universal_ **(BvU),** the second suit, was <u>not</u> about Elysium; the Plaintiff sued Universal, Kevin Spacey, et al, for displaying his work abroad (against TriggerStreet.com terms) and because Spacey destroyed the TriggerStreet social network, 6-days after _Briggs v Blomkamp_ **(BvB)**[15] went to appeals. _Briggs v Spacey_ **(BvS)**, the third suit, was also <u>not</u> about Elysium; it was a refiling of BvU, as Plaintiff failed to serve key BvU parties.

Judge Chhabria knew all of this, because he presided over BvU and BvS.

The District's insinuations about the Plaintiff's prior suits violate central copyright law precepts, which allow copyright claimants to defend their properties as often as they are infringed, without fear of court attack. Many corporations defend their properties countless times per year, and many of those efforts fail. <u>But no US court would bring up a corporation's previous failures, to undermine present or future actions</u>. **This shows clear bias against the Plaintiff**, which is unlawful, and against the fairness credo of _Skidmore v Led Zeppelin_ (see p. 32, herein).

While misrepresenting these prior cases, the District omitted imperative BvS facts: **(1)** MRC and Ari Emanuel operated about 11 secret shell companies,

---

[15] The Complaint shows the Defs produced numerous fake and backdated websites and IA crawls for the film _Elysium_ (pp. 120, 121). This is relevant because the Complaint contains a Rule 60 motion to remand BvB. [ER 23, 24, 30, 31]

indicating fraud and money laundering (more on p. 47); **(2)** Nov 13, 2017, the day

BvU was filed, Kevin Spacey disappeared for 13 months, until 2 days after Chabria

dismissed *Briggs v Spacey*[16], 12/24/18; **(3)** In BvS, Plaintiff informed the district

that MRC claimed a HQ office that did not exist, and filed fraudulent disclosures.

Finally, the Order falsely states, "Much of Briggs's 845-page complaint is

unintelligible." This is false. The Complaint is clear, and it is not 845 pages. It is

142 pages, with 700 pages of exhibits, because a plaintiff has the burden of proof.

**V. <u>ARGUMENT #5</u>: Judge Chhabria Abused His Discretion By Imposing Himself On This Action After Judge Orrick Recused (Chhabria Presided Over 2 Of Plaintiff's 3 Prior Actions). Plaintiff Moved To Disqualify Judge Chhabria, Who Erred By Not Stepping Down.**

Judge Chhabria presided over 2 of Plaintiff's prior suits. The Plaintiff reported

Judge Chhabria's improper rulings to *this* Court in his *Briggs v Spacey* appeal

(2019). In filing *This* Action, the Plaintiff was so concerned that Chhabria would

impose himself on this Action that he wrote on page *iv* of his Complaint: [ER 18]

"**Invitation To The Free Press**
24. This Complaint shows how the Defs used their media outlets and the Internet Archive to produce falsified documents to steal Plaintiff's work. They will likely use these resources to suppress this (see <u>Briggs v Spacey, dismissed Saturday, Dec 22, 2018</u>; also see p 119). Thus, Plaintiff invites the press to monitor the Defs' actions, as this matter moves forward."

---

[16] In BvS, Chhabria was also not satisfied with the volumes of evidence connecting NBCU to the infringement of Plaintiff's work. But, in this Action, *Plaintiff's Amended Motion In Limine* shows Mark Williams' (owner of ZGM) company *Williams Productions LLC*, became an NBCU subsidiary in 2007, a year after ZGM accessed the Plaintiff's Script; proving the Plaintiff correct (and Chhabria wrong) about NBCU's connection to the infringement of Plaintiff's work, in BvS.

Plaintiff was relieved when the Hon Judge Orrick was assigned to this case (03/04/20). But Judge Orrick suddenly recused (06/23/20), and Judge Chhabria was "assigned." Judge Chhabria's presence on this case is a mockery of law.

June 29, 2020, <u>six days after Judge Chhabria was assigned to this case, the Plaintiff filed a motion to disqualify Judge Chhabria</u>. But in the Order, Judge Chhabria **denied this motion**, citing *Herrington v. Sonoma County* (9th Cir. 1987).

But Judge Chhabria's citation of old Circuit law cannot withstand US Code.

**28 U.S. Code § 144**:
Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

And **28 U.S.C. § 455(a)** states:

"Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."

Thus, Judge Chhabria should have immediately stepped down.

Further, the Plaintiff's motion did not claim *he did not like Chhabria's prior rulings*. Plaintiff gave 6 reasons to disqualify, including the following example:

5. Judge Chhabria's Judgment in Briggs v Spacey showed extreme bias in favor of the defendants, as the Judgment did not cite one of the defendants' 20 arguments in their 3 motions to dismiss. Worse, Judge Chhabria actually created one or morel [sic] arguments that the defendants did not raise (Judge Chhabria's arguments were both wrong....

Judge Chhabria's refusal to disqualify himself was an abuse of discretion.

## VI. <u>ARGUMENT #6</u>: The Order Is Improper Because The District Improperly Assessed <u>Differences,</u> Rather Than <u>Similarities</u>.

*Cavalier v. Random House, Inc*., 297 F.3d 815, 822 (9th Cir. 2002) instructs:

"The "extrinsic test"… focuses on the "**articulable similarities**" between the two works. (quoting *Krofft*, 562 F.2d at 1164)"

*Articulable similarities* are similarities that are expressed. Thus, courts are to assess the **similarities** that <u>plaintiffs *expressly* claim</u>. But the District did **not** assess the similarities. Rather, it omitted all of the Plaintiff's claims, and only describes the differences, [ER 12, 13] which is against law, per *LA Printex V. Aeropostale*:

"But a copyright defendant need not copy a plaintiff's work in its entirety to infringe that work. **It is enough that the defendant appropriated a substantial portion** of the plaintiff's work... ("[I]t is enough that substantial parts were lifted; no plagiarist can excuse the wrong by showing how much of his work he did not pirate.")

The Printex court also explained that differences mean nothing, if there is also similarity, AND if there is both *difference* and *similarity*, *that* is a basis to remand:

"The differences noted by the district court do not compel the conclusion that no reasonable juror could find that Defendants' design is substantially similar to C30020. <u>Rather, in light of the similarities described above, the differences support the opposite conclusion, that there is a genuine dispute of material fact on substantial similarity</u>. . See 4 Nimmer on Copyright § 13.03[B] 2 3 4 / [1][a] ("It is entirely immaterial that, in many respects, plaintiff's and defendant's works are dissimilar, if in other respects, similarity as to **a** substantial element of plaintiff's work can be shown.")...

The District Order/Judgment is unsound and improper.

## VII.     <u>ARGUMENT #7</u>: The District Erred By Failing To Give The Plaintiff's Script *Broad* Protection.

*Feist* explains that Copyright protection was intended be fairly easy to attain:

"To qualify for copyright protection, a work… must possess "at least some **minimal degree of creativity**."....."Although copyright protects only original expression, it is **not difficult to meet the <u>famously low bar</u> for originality**."..."[t]he <u>vast majority of works make the grade quite easily</u>..."



2
3
4
5              *Above: Charlie Brown (left); Caillou (right).*
6      62.  Like most characters and stories, **nothing about Charlie Brown is original**.  He is
7   composed of a few common ideas, joined together in a unique, minimally creative way.

Page 5 of the Complaint (above) explains **broad** protection.



5
6
7
8
9
10    568.  In 1977 (*Sid & Marty Krofft Television Productions Inc v. McDonald's Corp*) Mayor
11  McCheese (left) was found to be substantially similar to H.R. Pufnstuf (right).  Although
12  they had little in common but wide mouths and oversized heads, they had a similar *feel*.

Page 116 of the Complaint (above) explains that **highly creative works** (with broad) tolerate little similarity. Thus, in *Krofft v. Mcdonald's*, Mayor McCheese (above left) was found to infringe H.R. Pufnstuf (right), although <u>they did not look alike, **at all**, they had a similar feel</u>. *LA Printex v Aeropostale* explains:

"Moreover, because we conclude that stylized fabric designs like C30020 are properly entitled to "broad" copyright protection, it is <u>not necessary that Defendants' design be "virtually identical" to infringe</u>"

The District erred by not conferring *broad* on the Plaintiff's Script.

41

## VIII.   <u>ARGUMENT #8</u>: The Order Is Improper As It Unduly Dismissed The Complaint, Ignored The Defs' Criminal Internet Fraud, Threatens America's Status As A World Leader, And Threatens America Itself.

Page 2 of the Order, the District wrote: "**Briggs also describes <u>a vast conspiracy</u> to hide this alleged theft—one that includes publishing fraudulent websites to falsely portray that these works predate his own**." This passage is calculated to undermine the credibility of the evidence. The Court's failure to examine the evidence, seems a crime in itself. The 142 page Complaint carefully explains how the Defs' criminal internet fraud scheme worked, and presents about 500 pages of FRE Rule 902 compliant evidence concerning this fraud.

The Defs produced dozens of fake web-articles. Def Internet Archive (**IA**) made thousands of fake crawls of the fake articles. On valid IA *Wayback Machine* web searches, when one enters a web address into the *Wayback* app, the *Wayback* will return a URL (in the upper address bar) that places the IA's prefix (**https://web.archive.org/web/\*/**) before the web-address entered by the user. Thus, if a user enters "www.walmart.com" (no quotes), the Wayback will return a URL reading: "https://web.archive.org/web/\*/**www.walmart.com**." This pattern is always the case for <u>valid</u> IA *Wayback* searches.

As the Plaintiff composed his Complaint, for months, Google Chrome displayed URLs of the IA crawls that appeared valid, when, in fact, the actual IA search URLs of the fake web articles, as displayed in Chrome, were not accurate.

January 14, 2020, the Plaintiff solved the Defs' URL scheme by examining the IA's Wayback search URLs in his Google's **Chrome** browser address bar, then comparing them to the Wayback search URLs in his Windows **Explorer** browser address bar. Explorer showed the true URLs, while Chrome showed false URLs. The fraudulent URL elements that were suddenly visible in Explorer were four numerals, apparently years (eg, 2008, 2016, 2013, etc), adjacent to the asterisk in the URL. Thus, when Plaintiff used **Chrome** to search www.jackchaos.com on the Wayback, the URL read: https://web.archive.org/web/*/**www.jackchaos.com**. But on Jan 14, 2020, and thereafter, on Plaintiff's **Explorer** browser, the URL read "https://web.archive.org/web/**2016\***/www.jackchaos.com". (The "**2016**" is the fraudulent element that was hidden in Chrome.)[17]

Jan 14, 2020, after learning Chrome was displaying false URLs, the Plaintiff video-taped himself entering the fake articles' addresses into the Wayback app, in his Explorer **and** Chrome browsers. While making this video, Plaintiff happened to record the Defs' hack into his computer. (See DVDs attached to Complaint).[18]

Remarkably, the same day that the Plaintiff filmed the hackers hack into his computer, January 14, 2020, the **NSA** announced a vulnerability in Google's Chrome browsers, which allowed hackers to send false URLs to targeted browsers.

---

[17] The Order **also** omits any mention of the Declaration of Dr. Morgan Marchbanks, who confirmed the Plaintiff's description of the Defs' URL scheme.

[18] The Plaintiff also uploaded these videos to YouTube. See pp. 13,14, herein, for the URLs.

Shortly after this hacking, Chrome began to display the same, accurate IA URLs that Explorer displayed (with the improper date-asterisk elements visible).

The Complaint also alleges that Google LLC manipulated Chrome search results, to bury the Plaintiff's efforts to market his film (The Amazing Mr Excellent) and to finance his other film ideas. **Google LLC's motion to dismiss does not deny this**; rather, <u>Google claims to have a First Amendment right to omit the Plaintiff's listings from its search results</u>. [ER 67, 68] By omitting Plaintiff's listings, the Defs intended to keep the Plaintiff their poor, exploitable, cash cow, until he died.

## IX. The District Order's Deep Flaws Indicate That The <u>Department Of Justice</u> (William Barr) May Have Influenced The District Order, To Protect US President Donald Trump.

The US Department of Justice (**DoJ**) may have improperly influenced the District Order, and had reason to do so: **(1)** There is a tie between President Trump and the theft of the Plaintiff's ideas (see pp. 6-7); **(2)** There is an ongoing plan to actualize Plaintiff's ideas of aggregated data defense and policing systems; **(3)** The Defs and Trump may be involved in a plan to sell private American data to Russia; **(4)** While in office, President Trump took action in furtherance of this plan.[19]

The Plaintiff's 5th motion in limine shows that 8 federal websites, including the **CDC**, the **Dept of Health and Human Services**, and the **Dept of Homeland**

---

[19] It is troubling that no DoJ or FBI investigators have asked to see the Plaintiff's many computer hard-drives, destroyed or harmed by the Defs' hackers' viruses.

**Security** have produced over 100 fake web-pages related to Plaintiff's idea o*f aggregated data*. These falsified pages use the Defs' same IA *Wayback Machine* URL crawl scheme (see Arg #9). [ER 56-58]  Plaintiff made 2 videos analyzing the first 26 of these web-pages, posted at **https://youtu.be/8E3qt2facA0**, and **https://youtu.be/2XTHKDMbrWs**. Only President Trump could have authorized publishing false documents/information on numerous federal websites.

## SUMMATION

### Plaintiff's' Ideas Animate Science, Industry, And Politics

The Plaintiff's Script showed a corrupt leader rule by controlling the courts and the media, and showed it is possible to predict the future by aggregating data, and replicating billions of human souls—into a giant Universe accelerator. Bizarrely, Google and other corporations thought this was a great idea. [ER 69-71]

**(1)** 2004-05, Plaintiff's Script introduced lunar mining, and capturing comets:

> PUBLIC ADDRESS:  [ER 32]
> 95 percent of the materials used to construct Uberopolis were
> mined and produced at President Drexler's lunar refinery …
> PUBLIC ADDRESS:  [ER 33]
> All six billion gallons of water in the Uberopolis Harbor were
> secured when Drex-Tech captured the RathmanTuttle comet…

2013, NASA shared a plan to capture an asteroid, for entrepreneurs to mine. September **2020**, NASA announced a plan to incentivize private lunar mining.

**(2)** The villain of the Plaintiff's script planned to end the current oil industry economy, for a clean economy, after a **30-year transition plan**:

DREXLER: (disgusted) [ER 34]
Tamara would have destroyed the energy industry and our
economy for her cause. I've planned a **thirty year phasing**;
allowing industry to adjust ...

Fall 2020, during the sole US Presidential debate, President-elect **Joe Biden**

said he will phase out oil, for clean power, with a **30-year transition plan**.

**Plaintiff's Complaint Helps Protect The U.S.**

Page 124 of the Complaint [ER 27] explained that several tech companies

seem intent to create US defense systems based on the Plaintiff's aggregated data

theory, and warned of the vulnerabilities in these systems. The Plaintiff wrote:

"For the record, although these ideas make for a great sci-fi plot, Plaintiff
believes, in practice, these systems will foment dissent and give foreign
hackers (of the systems or the data) the ability to predict US military
responses and allow hackers (or the owners) to predict markets.]"

April 8, 2020, **five weeks after** the Plaintiff warned of this threat, the DoJ

stopped Google from activating an undersea internet cable between the US and

Hong Kong (China), which Google and Facebook laid between 2016 and 2018,

although the cable was approved to Hong Kong in 2016 (see below).

**PHYS ORG**

Home / Technology / Telecom

OCTOBER 12, 2016

# Google, Facebook team on undersea cable to Hong Kong

https://phys.org/news/2 016-10-google-facebook-team-undersea-cable.html

46

[NOTE: Re Plaintiff's aggregated data defense and policing concept: On page 3 of the *Plaintiff's Amended Opposition To Google LLC's MTD*, filed May 28, 2020, the Plaintiff explained: ""**Plaintiff believes there are at least <u>2 more ways</u> that this sort of global "simulator" based defense system could be hacked into catastrophic failure**..."" (E.R. 70)  Then, Sunday, Dec 13, 2020, just days before the Plaintiff submitted this Brief, news outlets reported that Russia had hacked into the US Treasury, Commerce and others major departments, by hacking through their **SolarWinds** software.[20] The Plaintiff believes Russia exploited one of the "**2 more**" vulnerabilities mentioned in his Opposition to Google's MTD.]

Ramifications

As the Plaintiff wrote his Complaint, August 2019 to March 3, 2020, CEOs of the "Big 6" film studio began resigning: **1.** Jan 2020, Steve Burke stepped down at NBCUniversal; **2.** Jan 2020, 20CFOX's Emma Watts resigned; **3.** Feb 2020, Bob Iger resigned at Disney; **4.** April 2020, WarnerMedia's John Stankey resigned.[21]

March 4, 2020, the Plaintiff filed his Complaint. Ten days later, California went into Covid-19 closure: film and TV production shut down; producers could

---

[20] SolarWinds is owned by Silver Lakes Partners, who co-owns WME with Ari Emanuel (a defendant in Briggs v Spacey, and co-owner of MRC—a defendant in Briggs v Blomkamp). Thus, had the 9th and Attorney General Xavier Becerra acted on the business fraud that the Plaintiff reported in Briggs v Spacey, the US government may have chosen not to partner with Silver Lake Partners, a company associated with disreputable partners.

[21] The CEOs of the other two *Big 6* studios' (Sony Pictures & Paramount Pictures) were appointed in Mar & June 2017, just after President Trump took office.

not release their completed films because theatres were closed. Far worse, April 2020, George Floyd was killed by police, triggering National protests. In the middle of all of this, **dozens** of major film and TV executives began resigning. Then, **while losing hundreds of millions of dollars per week**, Hollywood began hiring dozens of minority and women film executives and producers, and companies like Disney (with poor civil rights records) began airing *Black Lives Matter* support messages and pledging millions to Black causes. These resignations, donations, and mass hirings of minorities and women—amid huge profit losses, all occurring shortly after the filing of *this* Suit, are not coincidental.[22] It is also not coincidental that September 4, 2020, The US Court of Appeals ruled that the NSA's surveillance program is unlawful.

Concerns

Feb 20, 2020, the *L.A. Times* published an article "Trump has flipped the 9th Circuit—and some new judges are causing a 'shock wave'," which explained:

> "Of the senior judges who will be deciding cases on "merits" panels — reading briefs and issuing rulings — 10 are Republicans and only three are Democratic appointees, Smith said."

---

[22] Given that the infringement of the Plaintiff's works involve News Corp, Amazon Microsoft, and the **Big 6 film studios**—whose parent corporations own most of America's major news outlets (CNN, FOX News, MSNBC, ABC, CBS, NBC...) and given that these companies sent multiple representatives to *The Lobby* (which may have been a convention to plan a covert White Nationalist government -based on *aggregated data*; a concept stolen from a biracial/Black American), it is unlikely these outlets will report on this Action (or the Plaintiff's coming actions).

Two weeks before this article was published, and a month before Plaintiff filed his Complaint in this matter, the 9th suddenly ruled on *Briggs v Spacey*[23] (**BvS**),[24] two years faster than it ruled on *Briggs v Blomkamp* (**BvB**). Thus, Judge Chhabria was able to cite the 9th's affirmation of his BvS ruling, to make his ruling in *this* matter (the District *Order/Judgment*) appear more credible. Troubling.[25]

Also troubling: Mar 9, 2020, 5 days after the Plaintiff filed his Complaint, the 9th released its *Skidmore v Led Zeppelin* ruling, which greatly reduced (if not eliminated) the access requirements in infringement cases. This monumental reversal is a concern, because **in *Skidmore v Led Zeppelin* there was no access dispute.** Thus, 5 days after the Plaintiff filed his Complaint (showing that Hollywood hacks and steals scripts), before the 9th could be excoriated for abetting the Hollywood crime machine (by failing to update its *access* standards for 20 years), the 9th entered its *Skidmore v Led Zeppelin* ruling, reversing its access position, and committing to treating unrepresented litigants fairly —all of this in *Skidmore*, a case with no access question, and no unrepresented litigants. Hmm.

---

[23] Consistent with Argument #1, the 9th's **un**published BvS ruling omitted the Plaintiff's actual claims, and did not explain that Judge Chhabria released his BvS order on a Saturday, 3 days before Christmas, etc.

[24] Also concerning, regarding *merits panels,* are the facts that Judge Silverman sat on both the BvB and BvS panels, and Judge Tallman (who sat on the BvS panel) sat on the US Foreign Intelligence Surveillance Court of Review; thus, he may be acquainted with Steven Weinstein (MovieLabs; US intelligence agencies).

[25] The fact that the 9th will take 3+ years to decide cases when it favors the film Studios to do so (BvB), or will hurry to decide cases when it favors the Studios (BvS) has a very troubling appearance. Creators need swift, fair, transparent action.

Seven months later, the District entered the Order in this matter, But the Order shows that, against Skidmore's call to apply Copyright Law fairly, the 9th's district courts can now, **at the pleading stage**, protect the film industry via omission, opacity and discretionary rulings (not appropriate in infringement cases), when no Hollywood plaintiff has EVER been dismissed at the pleading stage. Thus, the Plaintiff will file a share of his future suits in the Second Circuit.

The Plaintiff has included a few details, herein, that are not related to his Complaint's central claims (e.g., the theft of private Americans' data), because this is a public document, and the public should have knowledge of these matters.

The Plaintiff suggests adding the elements *climax, crisis, conflict, characters, scenes,* g*oal, events, objects/props* and *conceptual technology* to the extrinsic test list. The existing list (plot, themes, dialogue, mood, setting, pace, sequence) is too narrow, and includes general and subjective elements (pace, mood). A hero's goal is more important than the hero him/herself, and many works have no themes. Creators need a test list that assesses the most important story elements.

## CONCLUSION:

For the foregoing reasons, the Appellant asks This Court to REVERSE the District Court's Order/Judgment, in favor of the Appellant, or REMAND for trial.

Dated: December 16, 2020.     Respectfully Submitted:  /s/ Steve Wilson Briggs
                                                          Steve Wilson Briggs
                                                          Appellant, In Persona Propria

50

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Circuit Rule 28-2.6, there are no known related cases.

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rules of Appellate Procedure 32(e), which allows for local circuit court variation, and pursuant to Ninth Circuit Rules 32-1(a), which states that briefs may not exceed 14,000 words, and 32-1(f), which requires that typewritten opening brief may not exceed 50 pages, **<u>I hereby certify that</u>** the preceding and attached brief of Appellant Steve Wilson Briggs contains **<u>13,011</u>** words, excluding those parts exempted by FRAP 32(f). I further certify, per FRAP 32(a)(5) and 32(a)(6) that the attached Opening Brief was rendered in a proportionally spaced typeface, and size 14-point Times New Roman font.

Dated: December 16, 2020                    /s/ Steve Wilson Briggs

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing **Opening Brief Of Appellant/Plaintiff Steve Wilson Briggs** with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on December 16, 2020.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: December 16, 2020                    /s/ Steve Wilson Briggs