# No. 20-17229

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

———————————

**STEVE WILSON BRIGGS,**
*Plaintiff-Appellant,*

v.

**JAMES CAMERON, et al.,**
*Defendants-Appellees.*

———————————

**ANSWERING BRIEF OF DEFENDANTS-APPELLEES JAMES CAMERON, NEWS CORP., TWENTIETH CENTURY FOX FILM CORP., and LIGHTSTORM ENTERTAINMENT INC.**

———————————

JASSY VICK CAROLAN LLP
Jean-Paul Jassy (Cal. Bar No. 205513)
Kevin L. Vick (Cal. Bar No. 220738)
Elizabeth Baldridge (Cal. Bar No. 313390)
800 Wilshire Boulevard, Suite 800
Los Angeles, CA 90017
Tel: 310-870-7048
Fax: 310-870-7010

*Attorneys for Defendants-Appellees James Cameron, News Corp., Twentieth Century Fox Film Corp., and Lightstorm Entertainment Inc.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Defendants-Appellees Twentieth Century Fox Film Corp., News Corp., Lightstorm Entertainment Inc. and James Cameron submit the following statement identifying their respective parent companies and any publicly-held corporation that owns 10% or more of their stock:

1. Twentieth Century Fox Film Corp. is the indirect, wholly-owned subsidiary of The Walt Disney Company, a publicly-traded company;

2. James Cameron (an individual) is a Defendant-Appellee in this proceeding and 100% owner of Lightstorm Entertainment Inc.; and

3. News Corp. has no parent company, and no publicly-held company owns more than 10% of its stock.


Dated:  March 12, 2021       JASSY VICK CAROLAN LLP


By_____ */s/ Jean-Paul Jassy*_____
JEAN-PAUL JASSY
Attorneys for Defendants-Appellees
James Cameron, News Corp.,
Twentieth Century Fox Film Corp. and
Lightstorm Entertainment

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ...................................................................... 1

II.  STATEMENT OF JURISDICTION .............................................. 4

III.  COUNTER STATEMENT OF ISSUES PRESENTED FOR REVIEW ...... 4

IV.  STATEMENT OF FACTS AND OF THE CASE ........................................ 5

    A.  FACTUAL BACKGROUND ...................................................... 5

        1.  Allegations Relating To Access To The Underlying Work ........ 5

        2.  Summary of Plaintiff's Screenplay *Butterfly Driver* ................... 6

        3.  Summary of *Avatar* .................................................... 8

        4.  Summary of *Taken* .................................................... 11

        5.  Plaintiff's Complaint Also Included Causes of Action for Intentional Misrepresentation And Breaches Of Contract And Confidence, But He Did Not Allege Wrongdoing By Defendants ................................................................. 12

    B.  DISPOSITION BELOW ...................................................... 12

V.  STANDARD OF REVIEW ...................................................... 14

VI.  ARGUMENT ........................................................................ 15

    A.  THE DISTRICT COURT CORRECTLY DISMISSED PLAINTIFF'S COPYRIGHT CLAIMS ........................................ 15

        1.  Plaintiff Failed To Plausibly Allege Access ............................. 16

        2.  Neither *Avatar* Nor *Taken* Is Substantially Similar To Plaintiff's Screenplay ................................................. 20

            a.  Plaintiff's Alleged Similarities Only Consist Of Unprotectable Elements Which Must Be Filtered Out From The Substantial Similarity Analysis ........................ 22

i

b. *Avatar* Is Not Substantially Similar To *Butterfly Driver*... 23

c. *Taken* And *Butterfly Driver* Are Also Not Substantially Similar ............................................................. 32

3. The District Court Did Not Err With Respect To The "Selection And Arrangement" Test ........................................... 40

4. Plaintiff's Other Piecemeal Arguments Cannot Change The Unavoidable Conclusion That The Works At Issue Lack Substantial Similarity As A Matter Of Law ............................ 44

B. THE DISTRICT COURT ALSO PROPERLY DISMISSED PLAINTIFF'S ANCILLARY CLAIMS .......................................... 46

1. Plaintiff's Claims Are Time-Barred .......................................... 47

2. Plaintiff Failed To Allege The Required Elements For His Ancillary Claims ...................................................................... 49

a. The Breach Claims Failed As A Matter Of Law .............. 49

b. The Intentional Misrepresentation Claim Also Failed ...... 50

C. THE DISTRICT COURT DID NOT ERR IN ANY OF THE OTHER WAYS PLAINTIFF ARGUES ........................................... 52

VII. CONCLUSION ............................................................................... 54

CERTIFICATE OF COMPLIANCE .................................................... 55

CERTIFICATE OF SERVICE ............................................................. 56

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Abdullah v. Walt Disney Co.*,
 No. 2:15-cv-09581-SVW-JPR, 2016 WL 5380930 (C.D. Cal.
 Mar. 14, 2016) ................................................................. 16

*Alliance Mortgage Co. v. Rothwell*,
 10 Cal. 4th 1226 (1995) ................................................... 50

*Art Attacks Ink, LLC v. MGA Entmn't Inc.*,
 581 F.3d 1138 (9th Cir. 2009) ............................... 17, 19

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) ......................................................... 16

*Basile v. Sony Pictures Entmn't, Inc.*,
 No. CV 14-04264, 2014 WL 12521344 (C.D. Cal. Aug. 19, 2014) ............ 37

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007) ......................................................... 16

*Benay v. Warner Bros. Entmn't, Inc.*,
 607 F.3d 620 (9th Cir. 2010) ...................... 15, 20, 25, 39

*Berkic v. Crichton*,
 761 F.2d 1289 (9th Cir. 1985) ............... 16, 21, 22, 31, 39

*Bernal v. Paradigm Talent & Literary Agency*,
 88 F. Supp. 2d 1043 (C.D. Cal. 2010) ........................... 20

*Bissoon-Dath v. Sony Computer Entmn't Am., Inc.*,
 694 F. Supp. 2d 1071 (N.D. Cal. 2010) ........................ 35

*Briggs v. Blomkamp*,
 70 F. Supp. 3d 1155 (N.D. Cal. 2014) .................. 5, 17, 19

*Briggs v. Sony Pictures Entmn't*,
 714 Fed. App'x 712 (9th Cir. 2018) ........................ 5, 19

*Briggs v. Spacey*,
 No. 3:18-cv-4952 (N.D. Cal. Dec. 22, 2018), *aff'd*, 793 Fed.
 App'x 634 (9th Cir. 2020) ......................................... 5, 52

*Briggs v. Universal Pictures*,
No. 3:17-cv-6552 (N.D. Cal. Apr. 25, 2017) ...........................................5, 52

*Campbell v. Walt Disney Co.*,
718 F. Supp. 2d 1108 (N.D. Cal. 2010).................................16, 21, 29, 36, 40

*Carlini v. Paramount Pictures Corp.*,
No. 2:19-cv-8306 (C.D. Cal. Feb. 2, 2021).................... 17, 24, 28, 31, 36, 38

*Cavalier v. Random House*, *Inc.*,
297 F.3d 815 (9th Cir. 2002) ...............................................................21, 39

*Christianson v. W. Pub'lg Co.*,
149 F.2d 202 (9th Cir. 1945) ........................................................................16

*Cline v. Reetz-Laiolo*,
329 F. Supp. 3d 1000 (N.D. Cal. 2018)........................................................17

*Corbello v. Valli*,
974 F.3d 965 (9th Cir. 2020) ........................................................................27

*DC Comics v. Towle*,
802 F.3d 1012 (9th Cir. 2015) ......................................................................30

*Doe v. Roman Catholic Bishop*,
189 Cal. App. 4th 1423 (2010) .....................................................................48

*Esplanade Prods, Inc. v. Walt Disney Co.*,
CV 17-02185, 2017 WL 5635027 (C.D. Cal. Nov. 8, 2017) .......................16

*Faris v. Enberg*,
97 Cal. App. 3d 309 (1979) ..........................................................................50

*Feist Pubs., Inc. v. Rural Tel. Serv. Co.*,
499 U.S. 340 (1991).......................................................................................15

*Fillmore v. Blumhouse Prods, LLC*,
No. 2:16-cv-04348-AB, 2017 WL 4708018 (C.D. Cal. July 7, 2017)..........19

*Flaherty v. Filardi*,
No. 03 Civ. 2167, 2009 WL 749570 (S.D.N.Y. Mar. 20, 2009)...................32

*Fulks v. Knowles-Carter*,
207 F. Supp. 3d 274 (S.D.N.Y. 2016) ..........................................................37

*Funky Films, Inc. v. Time Warner Entm't Co.*,
462 F.3d 1072 (9th Cir. 2006) .................................. 15, 20, 21, 25, 34, 38, 46

*Griffin v. Peale*,
No. CV 17-01153 JGB, 2018 WL 5117555 (C.D. Cal. Jan. 18, 2018).........19

iv

*Hagans v. Lavine*,
  415 U.S. 528 (1974)......................................................................51

*Harper & Row Publ'rs, Inc. v. Nation Enters.*,
  471 U.S. 539 (1985)......................................................................22

*Hayes v. Keys*,
  No. CV 14-62426 PA, 2015 WL 12734010 (C.D. Cal. Jan. 7, 2015)...........20

*Herrington v. Sonoma Cnty.*,
  834 F.2d 1488 (9th Cir. 1987) ......................................................52

*Jason v. Fonda*,
  526 F. Supp. 744 (C.D. Cal. 1981) .................................................19

*Jorgensen v. Epic/Sony Records*,
  351 F.3d 46 (9th Cir. 2003) ..........................................................18

*L.A. Printex Indus., Inc. v. Aeropostale, Inc.*,
  676 F.3d 841 (9th Cir. 2012) .................................................41, 45

*Loomis v. Cornish*,
  836 F.3d 991 (9th Cir. 2016) ........................................................18

*Marcus v. ABC Signature Studios, Inc.*,
  279 F. Supp. 3d 1056 (C.D. Cal. 2017) ....................................16, 27, 35, 38

*Meta-Film Associates, Inc. v. MCA, Inc.*,
  586 F. Supp. 1346 (C.D. Cal. 1984) ..............................................17

*Monreal v. GMAC Mortg., LLC*,
  948 F. Supp. 2d 1069 (S.D. Cal. 2013) ........................................50

*In re Mortg. Elec. Registration Sys., Inc.*,
  754 F.3d 772 (9th Cir. 2014) ........................................................18

*NBCUniversal Media, LLC v. Superior Court*,
  225 Cal. App. 4th 1222 (2014).....................................................47

*Olson v. Nat'l Broadcasting Co.*,
  855 F.2d 1446 (9th Cir. 1988) ..................................27, 28, 35, 39

*Orkin v. Taylor*,
  487 F.3d 734 (9th Cir. 2007) ........................................................49

*Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*,
  602 F.3d 57 (2d Cir. 2010) ...........................................................14

*Platt Elec. Supply v. EOFF Elec., Inc.*,
  522 F.3d 1049 (9th Cir. 2008) ......................................................48

*Rentmeester v. Nike, Inc.*,
883 F.3d 1111 (9th Cir. 2018) ...............................................15, 20, 21, 23, 36

*Rice v. Fox Broadcasting Co.*,
330 F.3d 1170 (9th Cir. 2003) .............................................................15, 36

*Ryder v. Lightstorm Entmn't Inc.*,
246 Cal. App. 4th 1064 (2016) .....................................................................46

*Satava v. Lowry*,
323 F.3d 805 (9th Cir. 2003) .......................................................................41

*Schkeiban v. Cameron*,
No. CV 12-0636, 2012 WL 5636281 (C.D. Cal. Oct. 4, 2012) ........16, 22, 26

*See v. Durang*,
711 F.2d 141 (9th Cir. 1983) .......................................................................14

*Shame on You Prods., Inc. v. Banks*,
120 F. Supp. 3d 1123 (C.D. Cal. 2015).....................................21, 28, 35, 36

*Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*,
562 F.2d 1157 (9th Cir. 1977) .....................................................................21

*Silas v. HBO*,
201 F. Supp. 3d 1158 (C.D. Cal. 2016)...........................................26, 30, 34

*Silas v. HBO*,
713 Fed. App'x 626 (9th Cir. 2018) .....................................................16, 26

*Simo v. Union of Needletrades, Indus. & Textile Empls., Sw. Dist. Council*,
322 F.3d 602 (9th Cir. 2003) .................................................................14, 47

*Skidmore as Trustee for Randy Craig Wolfe Trust v. Led Zeppelin*,
952 F.3d 1051 (9th Cir. 2020) .................................. 15, 21, 40, 41, 42, 43, 44

*Spinner v. Am. Broadcasting Co.*,
215 Cal. App. 4th 172 (2013) ......................................................................47

*Twentieth-Century Fox Film Corp. v. MCA, Inc.*,
715 F.2d 1327 (9th Cir. 1983) .....................................................................45

*UMG Recordings, Inc. v. Shelter Capital Partners LLC*,
718 F.3d 1006 (9th Cir. 2013) .....................................................................14

*United States v. Ford*,
293 F. Supp. 3d 1138 (E.D. Cal. 2018) .......................................................52

*U.S. v. Martin*,
278 F.3d 988 (9th Cir. 2002) .......................................................................52

*Van v. Cameron*,
   No. 10cv1051, 2011 WL 13121345 (S.D. Cal. July 13, 2011) .................... 16

*Warner Bros. Pictures v. Columbia Broadcasting System*,
   216 F.2d 945 (9th Cir. 1954) ........................................................ 42

*Zella v. The E.W. Scripps Co.*,
   529 F. Supp. 2d 1124 (C.D. Cal. 2007) ........................................... 13

## FEDERAL STATUTES

17 U.S.C. §§ 101, *et seq.* .................................................................... 4

28 U.S.C. § 144 ................................................................................ 52

28 U.S.C. § 455 ................................................................................ 52

28 U.S.C. § 1291 ................................................................................ 4

28 U.S.C. § 1331 ................................................................................ 4

28 U.S.C. § 1338(a) ............................................................................ 4

## FEDERAL RULES

FRCP Rule 9(b) ............................................................................... 50

FRCP Rule 12(b)(6) ..................................................................... 13, 15

## STATE STATUTES

California Code of Civil Procedure § 338(d) ......................................... 47

California Code of Civil Procedure § 339 ............................................. 47

## I.    INTRODUCTION

This case is Plaintiff-Appellant Steve Wilson Briggs' ("Plaintiff") fourth action based on alleged copyright infringement of his screenplay *Butterfly Driver*. For the fourth time, Plaintiff's speculative and implausible claims demonstrate a fundamental misunderstanding and misapplication of copyright law.  On appeal, Plaintiff even advances a series of conspiracy theories about how the alleged infringement is part of a broader plot that threatens national security.  Appellant's Opening Brief ("AOB"), Dkt. No. 4, at 1.  In any event, as a matter of law, Plaintiff has not met his burden of plausibly alleging the elements necessary to establish a copyright infringement claim:  access and substantial similarity.  The district court's decision to dismiss Plaintiff's action should be affirmed.

Plaintiff asserts that he is the author of "countless copyrightable expressions," the theft of which has become so "vital" to the film industry that he has been the subject of "20+ years" of computer hacking by Google and the federal government.  *Id.* at 1-4.  He claims that his 2005 screenplay consists of "profoundly original ideas" including the first ever "family-centric" sci-fi screenplay, the first ever sci-fi screenplay to take on political and social issues or to discuss "modern religion and God," the idea of a hero going to "impossible lengths" for the life of his child, the concept of an "idealistic warrior woman," and the setting of a "dystopic sci-fi-scape."  *Id.* at 1-2.  According to Plaintiff's

Opening Brief, "[a]ll of these [concepts] came from [him]," and Defendants-

Appellees Twentieth Century Fox Film Corp. ("Fox"), News Corp., Lightstorm

Entertainment Inc. ("Lightstorm") and James Cameron ("Cameron") (collectively,

"Defendants") conspired to steal them by hacking Plaintiff's computer, creating

"fraudulent web articles," and faking Internet Archive crawls, among other actions.

*Id.* at 2-3.[1]  Plaintiff even claims that the purported scheme goes as far as being

connected to Russia, Ukraine, and the Trump family.  *Id.* at 7.

The copyright protection Plaintiff argues he deserves would effectively give

him a monopoly over a huge range of generic ideas and stock themes, including the

concept of a visionary hero, stories about environmentalism, corporate interests as

villainous, societal divisions, car chases, a dark mood with a hopeful ending, and

the primacy of family.  Plaintiff has no copyright interest in any of this.

Dismissal of copyright claims is proper where a plaintiff cannot plausibly

allege that defendants had access to plaintiff's work, and/or, where upon

comparison of the works at issue, plaintiff's work is not substantially similar to the

---

[1] News Corp. is not even a proper party to this action.  As Defendants set forth in
their Motion to Dismiss below, the business entity now known as News Corp. did
not exist as a corporate entity at any time relevant to the allegations in the
Complaint and had no involvement in any of the activities alleged in the
Complaint.  Moreover, even if News Corp. were a proper defendant (although it is
not), the claims against it would fail for the same reasons that they fail against the
other Defendants.

allegedly infringing works. Both access and substantial similarity must be present to state a claim for copyright infringement. Here, neither are present.

As to access, Plaintiff's Complaint offered only speculative allegations that rest on the conjecture that, because various people knew each other, they must have passed around Plaintiff's script. The law requires more direct and plausible allegations of access, which Plaintiff did not—and cannot—provide.

As for substantial similarity, Plaintiff claims that his work was copied by two entirely different films: *Avatar* (2009), a science-fiction love story featuring 10-foot-tall, humanoid, blue-skinned natives called the Na'vi set on a distant moon threatened with environmental collapse, and *Taken* (2008), an action-adventure film set in Paris and Los Angeles about a father searching for his kidnapped daughter. *See id.* at 19-41. It defies credibility that these two very different films both are derived from copyrightable elements in Plaintiff's screenplay. When the protectable elements of Plaintiff's screenplay are compared to those in *Avatar* and *Taken*, there is no substantial similarity as a matter of law.

This is the quintessential case where courts can and should dismiss an infringement claim on the pleadings for lack of substantial similarity. In addition, Plaintiff's ancillary claims for intentional misrepresentation, breach of contract and breach of confidence were time-barred, failed to include essential elements, and were not linked to any conduct by these Defendants. The district court concluded,

and this Court should also find, that each of Plaintiff's causes of action failed to state a claim on which relief can be granted. This Court should affirm the district court's order of dismissal in all respects.

## II. STATEMENT OF JURISDICTION

The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this is an action arising under the Copyright Act of 1976, 17 U.S.C. §§ 101, *et seq*. *See* 28 U.S.C. § 1338(a) ("The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to . . . copyrights"). This Court has jurisdiction pursuant to 28 U.S.C. § 1291 to review the judgment dismissing Plaintiff's Complaint.

## III. COUNTER STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.    Did the district court properly dismiss Plaintiff's copyright claims without leave to amend?

2.    Did the district court also properly dismiss Plaintiff's ancillary claims?

3.    Did the district court properly deny Plaintiff's motion to disqualify Judge Chhabria from presiding over the action?

## IV.   STATEMENT OF FACTS AND OF THE CASE

### A.   FACTUAL BACKGROUND

#### 1.   Allegations Relating To Access To The Underlying Work.

Plaintiff's Complaint alleged that 15 years before initiating this action, he wrote a script called *Butterfly Driver* about a futuristic city orbiting Earth and a person battling a greedy corporation. 1-SER-0069-0092; 0094-0104. Then, according to Plaintiff, Defendants took Plaintiff's ideas from *Butterfly Driver* to create two separate films: *Avatar* and *Taken*.[2] *Id.* The Complaint, filed in May of 2020, only offered convoluted, conclusory, speculative allegations of Defendants' access to *Butterfly Driver*. Principally, Plaintiff claimed that in 2006 he contacted a literary agency called "Zero Gravity Management," which he also refers to as "ZGM," about sending the agency a script. 1-SER-0003. The Complaint alleged that individuals at ZGM were "close friends" with an individual at Fox, 1-SER-0021, but Plaintiff did not allege how Fox or any of the other Defendants actually accessed the *Butterfly Driver* script.

---

[2] This suit is Plaintiff's fourth alleging that *Butterfly Driver* was infringed, with his earlier three cases all referencing alleged infringement by the 2013 film *Elysium*. *See Briggs v. Blomkamp*, 70 F. Supp. 3d 1155 (N.D. Cal. 2014); *aff'd as Briggs v. Sony Pictures Entmn't*, 714 Fed. App'x 712 (9th Cir. 2018); *Briggs v. Universal Pictures*, No. 3:17-cv-6552 (N.D. Cal. Apr. 25, 2017); and *Briggs v. Spacey*, No. 3:18-cv-4952 (N.D. Cal. Dec. 22, 2018), *aff'd*, 793 Fed. App'x 634 (9th Cir. 2020).

Plaintiff also alleged that, because he voluntarily placed the *Butterfly Driver* screenplay on a website called TriggerStreet.com, Defendants could have accessed it. *See*, *e.g.*, 1-SER-0060; 0094; 0182. Based on this vaguely theoretical chain of access, Plaintiff alleged claims for direct copyright infringement against all defendants in the case, 1-SER-0134, and vicarious copyright infringement against Fox and News Corp., 1-SER-0135, in addition to ancillary claims discussed below.

**2.      Summary of Plaintiff's Screenplay *Butterfly Driver***

*Butterfly Driver* centers on the story of Arlo Grainer.[3] Much of the action occurs in a fictional city called Uberopolis, orbiting by satellite above Earth, which serves as both an upscale neighborhood and a privately-owned prison. The villain is Peter Drexler, who owns Uberopolis and is President of the undefined "Global State," a geopolitical body of some sort on Earth. Drexler is also head of a huge media conglomerate and a manufacturer of pharmaceutical drugs.

At the beginning of the story, Arlo lives on Earth in a "Zone" outside the jurisdiction of the Global State with his estranged wife and two children, one of whom has a chronic illness. Arlo is a former Army pilot who was forced out of flight school due to occasional, debilitating headaches. Near the beginning of the story, some of Arlo's colleagues are killed by bounty hunters, and Arlo is warned

---

[3] 1-SER-0145-0264 (containing *Butterfly Driver* script attached to Plaintiff's Complaint); 1-SER-0069 (authenticating Exhibit X6 as *Butterfly Driver* script).

6

that the bounty hunters will soon seek out him and his family. The only way to keep his family safe is to send them to New York, which is in the Global State. But in order to "repatriate" and rejoin the Global State, they will need $100,000. To raise the money, Arlo accepts a risky transportation job, called a "butterfly run." On the butterfly run, he transports a scientist named Tamara Gwynn, who co-invented an energy device called an A-cell, across the country to Los Angeles. Police ambush them, Tamara is killed, and Arlo is falsely accused of her murder. He is sent to jail on Uberopolis to await trial, and federal agent Jerry Matthiessen is assigned to investigate. Jerry has been promised medical assistance for his sick son if Arlo's case is successfully prosecuted.

After Arlo sits in jail for four months, he escapes and returns to Earth. He finds that his seven-year-old daughter, Franny, is near death, relying on a respirator. Arlo learns that Franny needs a rare drug called Drexlerin, but he believes he saw some on Uberopolis. Arlo sets off for Uberopolis to try to find Drexlerin.

On his journey back to Uberopolis, Arlo enlists Jerry – who was in the Army with Arlo – as a reluctant assistant. Arlo forces a meeting with Drexler. In the midst of the meeting, Drexler reveals that he was also in the Army with Arlo but later stole the identity of yet another soldier and is not the "real" Drexler. Arlo threatens to use an A-cell device given to him by Tamara to destroy Uberopolis.

Drexler agrees to give Arlo a vial of Drexlerin in exchange for the A-cell. A fight ensues and Drexler shoots Arlo, but Arlo escapes by diving into Uberopolis's harbor, finding an escape hatch with the help of a dolphin. Arlo eventually reaches a shuttle and attempts to use it leave Uberopolis.

But Drexler finds Arlo again, almost killing him before Jerry saves Arlo by shooting Drexler with a stun-gun. Arlo and Jerry pilot the shuttle away from Uberopolis, but they are targeted by an attack missile, and then reverse course and fly the shuttle back toward Uberopolis, with the missile following. Just before the shuttle and missile collide with Uberopolis, Arlo and Jerry activate an evacuation pod, avoiding death. Uberopolis is destroyed by the missile. Back on Earth, Franny survives, but Jerry's son dies of respiratory illness.

**3. Summary of *Avatar***

*Avatar* is a science-fiction film set in the future on Pandora, a lush moon in a distant galaxy far from Earth.[4] Pandora has an exotic ecosystem, including unusual animals, bioluminescent plants and floating mountains. The protagonist in *Avatar* is Jake Sully, a paraplegic ex-Marine who goes on a mission to Pandora. Humans have colonized Pandora to mine unobtanium, a valuable mineral. They work for

---

[4] *See* Defendants' concurrently-filed Motion to Transmit physical copies of DVDs of *Avatar* and *Taken* before the district court, or, in the alternative, to take judicial notice of the DVDs.

the Resources Development Administration, the "RDA," and use specialized gear to survive in Pandora's atmosphere.

Pandora's native society is made up of a ten-foot-tall, blue, long-tailed humanoid species called the Na'vi. The Na'vi live in harmony with nature, and their culture cherishes the interconnectedness of species. To interact with the Na'vi, the RDA developed a method of genetically engineering bodies – avatars – resembling the Na'vi, which human operators can control through a mental link.

On Pandora, Jake works primarily with Colonel Miles Quaritch and Dr. Grace Augustine. The Colonel is in charge of security, and Jake soon learns that the Colonel is developing a plan to force the Na'vi out of their homes so that the RDA can mine unobtanium freely. The Colonel tells Jake that if he can find out what will entice the Na'vi to move off the land, Jake will be given a government-funded surgery to reverse his paralysis. In contrast to the Colonel's mercenary goals, Dr. Augustine is focused on studying the Na'vi and ensuring humans remain in harmony with the natives.

Using his avatar, Jake begins to explore Pandora, but he quickly ends up lost and threatened by wolf-like predators. A Na'vi woman named Neytiri arrives and saves him, fending off the creatures. Neytiri is initially distrustful of Jake. But, after jellyfish-like "woodsprites" float down from trees and land on Jake, Neytiri takes this as a good omen, and permits Jake to live. He meets Neytiri's clan of

Na'vi, who are also initially distrustful. However, the clan ultimately decides that Neytiri should train Jake in the Na'vi ways in order to facilitate peaceful human-Na'vi relations and understanding.

Over the months that follow, Jake shifts back and forth daily between his human and avatar forms. While living as a Na'vi through his avatar, he learns the skills of Na'vi warriors, including taming and riding dinosaur-like creatures. When he shifts back to his human form, he provides intelligence about the Na'vi to the Colonel. Over time, Jake develops a romantic relationship with Neytiri and privately loses his allegiance to the RDA.

The RDA eventually moves forward with plans to forcibly remove the Na'vi from their land. The Colonel destroys Neytiri's village, and Jake's longstanding agreement with the RDA is exposed. A battle ensues between the RDA and the Na'vi, and Dr. Augustine is killed. Back in his avatar, Jake is able to regain the trust of the Na'vi, and he helps summon the Pandoran wildlife to attack the RDA. In a final fight scene, Neytiri kills the Colonel to save Jake. After the RDA has been defeated, the Na'vi use a ritual to transfer Jake's consciousness to his Na'vi body. The film ends with Jake becoming one of the Na'vi, bound together with Neytiri, and leaving his human form behind.

4.    **Summary of *Taken***

*Taken* is an action-thriller film set in present-day United States and France. Bryan Mills, the protagonist, is highly skilled in espionage and security, but he finds it difficult to connect to his teenage daughter, Kim. When Kim asks to take a summer trip to Paris with her friend Amanda, Bryan initially hesitates, but he reluctantly agrees.

Upon arrival in Paris, Kim and Amanda are almost immediately kidnapped. Kim is on the phone with Bryan when the kidnappers enter her apartment, and he instructs her to yell out physical descriptions of them. With those clues, Bryan determines that the kidnappers are Albanian human traffickers. Bryan learns that realistically he has only 96 hours to find Kim, and he flies to France.

In Paris, Bryan reaches out to Jean-Claude Pitrel, an old contact in the French intelligence agency. Jean-Claude tells Bryan about an area of Paris known for human trafficking, and from there, Bryan follows a trail of clues tied to Kim. On this trail, Bryan finds Amanda's body. She has presumably died from a forced drug overdose. Bryan encounters other abducted girls, but leaves them behind, saving only one in order to get more clues to find Kim. Bryan captures, tortures and interrogates one of Kim's kidnappers, and learns that Kim has been sold to a gangster called Saint-Clair.

In seeking out Saint-Clair, Bryan discovers Jean-Claude is corrupt, but gets some information out of him about where he can find Saint-Clair. On this, Bryan infiltrates an underground human trafficking auction. He forces one of the bidders at gunpoint to buy Kim. After a fight at the auction, Bryan is tied up but escapes and learns that Kim is en route to a yacht owned by a Sheik named Raman. Bryan boards the yacht, where he finds Raman holding a knife to Kim's neck. Bryan shoots and kills Raman, saving Kim. Back in Los Angeles, Kim is reunited with her mother and stepfather.

### 5. Plaintiff's Complaint Also Included Causes of Action for Intentional Misrepresentation And Breaches Of Contract And Confidence, But He Did Not Allege Wrongdoing By Defendants.

In addition to his copyright claims, Plaintiff's Complaint asserted causes of action for intentional misrepresentation against Defendants, 1-SER-0136-0140, and breach of contract and breach of confidence against Fox and News Corp., 1-SER-0141-0143. These ancillary claims, which were generally based on Plaintiff's contention that various defendants used ideas contained in *Butterfly Driver* without compensating him, failed to identify any wrongdoing on Defendants' part. *See* 1-SER-0139-0143.

### B. DISPOSITION BELOW

Defendants moved to dismiss Plaintiff's Complaint pursuant to Federal Rule

of Civil Procedure 12(b)(6) for failure to state a claim. 1-ER-5.[5] Defendants

simultaneously requested that the district court take judicial notice of DVDs of the

films at issue, *Avatar* and *Taken*, which were not otherwise part of the record.[6] 1-

ER-5. Plaintiff did not file an opposition to Defendants' Request for Judicial

Notice. The *Butterfly Driver* screenplay was available to the district court because

it was attached to the Plaintiff's Complaint. 1-SER-0145-0264.

On October 16, 2020, the district court entered an order granting

Defendants' motion and dismissing Plaintiff's copyright claims with prejudice on

the grounds that Plaintiff did not plead and could not establish substantial

similarity between *Butterfly Driver*, *Avatar*, and *Taken*. 1-ER-11-16. The district

---

[5] Between Defendants' Motion to Dismiss filing and the resolution of the case in the district court, Plaintiff filed over a dozen declarations, requests for judicial notice, and purported motions in limine in which he sought to "add" "facts" and "evidence" to his case. *See* 1-ER-4-9. The district court did not permit Plaintiff to add factual allegations to his pleadings via these improper filings, but in its dismissal order, the court noted that "it has considered these motions in assessing whether there are any allegations [Plaintiff] could conceivably add to the complaint to state a claim, and they only confirm that he could not." 1-ER-16.

[6] Along with this Answering brief, Defendants simultaneously move this Court to transfer the physical exhibits of the *Avatar* and *Taken* DVDs so that the Court can review the underlying works for the purposes of the substantial similarity analysis. *See* Circuit R. 27-14 (governing transfer procedure). In the alternative, as set forth in their Motion to Transfer, Defendants request judicial notice of the DVDs. Courts may "take judicial notice of generic elements of creative works," as well as "documents [including copies of works] which are not physically attached to the complaint but whose contents are alleged in [the] complaint and whose authenticity no party questions." *Zella v. The E.W. Scripps Co.*, 529 F. Supp. 2d 1124, 1128-1129 (C.D. Cal. 2007).

court also dismissed Plaintiff's ancillary causes of action with prejudice on the basis that Plaintiff did not plead the required elements for those claims. *Id.*

## V. STANDARD OF REVIEW

Appellate courts review *de novo* a district court's dismissal of a complaint for failure to state a claim. *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1014 (9th Cir. 2013). In reviewing *de novo*, this Court accepts as true all of the factual allegations of Plaintiff's Complaint, but it need not take as true "descriptions of the [underlying] works contained in the pleadings" that run "contrary" to a review of the works themselves. *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010) (citation omitted). In the case of a conflict between allegations contained in the pleadings and the works themselves, the works "supersede and control contrary descriptions of them." *Id.*; *see also See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983) (rejecting plaintiff's "alleged similarities" as inconsistent with the works themselves). When reviewing *de novo*, the Court can affirm the dismissal "on any ground supported by the record," even if not relied on by the district court. *Simo v. Union of Needletrades, Indus. & Textile Empls., Sw. Dist. Council*, 322 F.3d 602, 610 (9th Cir. 2003) (affirming district court).

# VI.   ARGUMENT

## A.   THE DISTRICT COURT CORRECTLY DISMISSED PLAINTIFF'S COPYRIGHT CLAIMS

To state a claim for copyright infringement, a plaintiff must allege "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Funky Films, Inc. v. Time Warner Entm't Co.*, 462 F.3d 1072, 1076 (9th Cir. 2006) (quoting *Feist Pubs., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)).[7]  To plausibly allege the copying element, plaintiff must demonstrate that the defendant "had access to the plaintiff's work and that the two works are substantially similar." *Id.* (internal quotation marks omitted).  These are two separate requirements.  Without plausibly alleging both access and substantial similarity, the copyright claim cannot survive a Rule 12(b)(6) motion.  Under Rule 12(b)(6), the plaintiff's claims "must contain sufficient factual matter, accepted as

---

[7] The Ninth Circuit overruled in part a line of cases including *Funky Films*, 462 F.3d 1072, *Benay v. Warner Bros. Entmn't, Inc.*, 607 F.3d 620 (9th Cir. 2010), *Rentmeester v. Nike, Inc.*, 883 F.3d 1111 (9th Cir. 2018), and *Rice v. Fox Broadcasting Co.*, 330 F.3d 1170, 1177 (9th Cir. 2003) in *Skidmore as Trustee for Randy Craig Wolfe Trust v. Led Zeppelin*, 952 F.3d 1051, 1067 (9th Cir. 2020).  *Skidmore*'s disapproval is limited to these cases' statements that a higher degree of evidence of access permits more minimal allegations of substantial similarity. *Skidmore*, 952 F.3d at 1068-1069.  As explained below, this case does not involve a high degree of evidence of access, but, in any event, Defendants do not argue for a lower substantial similarity standard.  The other points of law from this line of cases remain valid, and *Skidmore* even cites to *Funky Films* approvingly for authority on the workings of the extrinsic test in the substantial similarity analysis. *See id.* at 1064.

true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Here, Plaintiff's Complaint did not plausibly allege either access or substantial similarity, and the Court can affirm dismissal of the copyright claims on either basis. Courts regularly dismiss copyright claims at the pleadings stage where required elements are missing from a plaintiff's claim, including where a review of the works themselves demonstrate the absence of the requisite similarity.[8] Lack of substantial similarity is a "defect [that] cannot be cured by amendment[.]" *Campbell v. Walt Disney Co.*, 718 F. Supp. 2d 1108, 1116 (N.D. Cal. 2010) (granting motion to dismiss).

### 1. Plaintiff Failed To Plausibly Allege Access.

Plaintiff has the burden to adequately allege that Defendants had access to his original work, but he did not do so and cannot do it here. *See Berkic v.*

---

[8] *See*, *e.g.*, *Christianson v. W. Pub'lg Co.*, 149 F.2d 202, 203 (9th Cir. 1945); *Cline v. Reetz-Laiolo*, 329 F. Supp. 3d 1000, 1041 (N.D. Cal. 2018); *Schkeiban v. Cameron*, No. CV 12-0636, 2012 WL 5636281, at *2 (C.D. Cal. Oct. 4, 2012) (dismissing infringement claim involving *Avatar*); *Van v. Cameron*, No. 10cv1051, 2011 WL 13121345, at *3-4 (S.D. Cal. July 13, 2011) (same); *Marcus v. ABC Signature Studios, Inc.*, 279 F. Supp. 3d 1056, 1065 (C.D. Cal. 2017); *Silas v. HBO*, 713 Fed. App'x 626, 627 (9th Cir. 2018) (affirming dismissal of claim that series *Ballers* infringed plaintiff's work); *Esplanade Prods, Inc. v. Walt Disney Co.*, CV 17-02185, 2017 WL 5635027, at *53 (C.D. Cal. Nov. 8, 2017) (dismissing claim that film *Zootopia* infringed plaintiff's proposed franchise, also called *Zootopia*); *Abdullah v. Walt Disney Co.*, No. 2:15-cv-09581-SVW-JPR, 2016 WL 5380930, at *9 (C.D. Cal. Mar. 14, 2016) (dismissing claim that film *Frozen* infringed well-known children's author's story).

*Crichton*, 761 F.2d 1289, 1291 (9th Cir. 1985) (plaintiff must allege "the defendant's access to his work").  Allegations of access must demonstrate a "reasonable possibility, not merely a bare possibility" of access—fanciful suggestions, speculation, conjecture and conspiracy theories do not meet the standard—but Plaintiff offers only convoluted and hypothetical routes and intermediaries by which Defendants might have accessed *Butterfly Driver*.  *Art Attacks Ink, LLC v. MGA Entmn't Inc.*, 581 F.3d 1138, 1143 (9th Cir. 2009) (finding insufficient allegations of access); AOB at 11-12.  In his Complaint, Plaintiff alleged that he sent his screenplay to ZGM, but he failed to allege any direct path from ZGM to Fox, Lightstorm, News Corp. or Cameron.  *See* 1-SER-0003-0069.  Without this, access has not been alleged.  Access "may not be inferred through mere speculation or conjecture" or based on a "speculative" sequence of events, *Briggs v. Blomkamp*, 70 F. Supp. 3d at 1165-66, nor are "chain[s] of hypothetical transmittals," *Meta-Film Associates, Inc. v. MCA, Inc.*, 586 F. Supp. 1346, 1355 (C.D. Cal. 1984), or "attenuated connections" sufficient. *Carlini v. Paramount Pictures Corp.*, No. 2:19-cv-8306, at *11 (C.D. Cal. Feb. 2, 2021) (rejecting plaintiff's access theory involving his interactions with two individuals related to the defendant, but where "none of the interactions was

17

substantial or involved the production of the allegedly infringing work").[9]  Access also cannot hinge on identifications of "potential intermediaries" through whom a defendant could have gained access to an underlying work.  *Loomis v. Cornish*, 836 F.3d 991, 996 (9th Cir. 2016).  And "corporate receipt of [an] unsolicited work" is insufficient "where there is no evidence of any connection between the individual recipients of the protected work and the alleged infringers."  *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 48 (9th Cir. 2003).   Here, it is not remotely apparent how ZGM transmitted the script to a purportedly new entity, Future Service Inc., which Plaintiff claims became a subsidiary of News Corp. years later.  *See* AOB at 33.  Plaintiff's allegations that individuals at ZGM were "close friends" with an individual at Fox are similarly unavailing.  1-SER-0021.  This merely recounts "potential intermediar[ies]," which is insufficient to plausibly allege access.  *Loomis*, 836 F.3d at 996.

Any attempt to establish access through Plaintiff's alleged posting of *Butterfly Driver* on TriggerStreet.com is likewise ineffective to establish access.

---

[9] Plaintiff also claims, for the first time on appeal, that Fox and News Corp. are "parent" companies of ZGM, but this allegation does not appear in the Complaint. *See* AOB at 33.  Generally, arguments cannot be raised for the first time on appeal. *See*, *e.g.*, *In re Mortg. Elec. Registration Sys., Inc.*, 754 F.3d 772, 780 (9th Cir. 2014) (declining to hear arguments for the first time on appeal).  In any event, Plaintiff still does not explain how the screenplay itself ever made its way to Fox or News Corp.

*See* AOB at 15-16. The general "availability" of an underlying work does nothing to establish that the relevant defendants actually accessed it. *Jason v. Fonda*, 526 F. Supp. 744, 776-777 (C.D. Cal. 1981) (availability of hundreds of copies of plaintiff's book in Southern California bookstores did not establish a reasonable possibility of access). Indeed, in one of the previous cases filed by Plaintiff, affirmed on appeal by this Court, the district court rejected the same TriggerStreet.com theory of access to *Butterfly Driver* as "entirely speculative." *Briggs v. Blomkamp*, 70 F. Supp. 3d at 1166, *aff'd as Briggs v. Sony Pictures Entmn't*, 714 Fed. App'x 712 (9th Cir. 2018). Claiming that a screenplay was posted on a website that was accessed by filmmakers does no more than suggest a "bare possibility" of access. *Art Attacks Ink*, 581 F.3d at 1143 (holding that a "slight chance" the defendant encountered plaintiff's work did no more than suggest a "bare possibility" of access, which was insufficient).

Without even addressing the issue of substantial similarity, dismissal of Plaintiff's copyright claims can be affirmed because the Complaint did not plausibly allege access. *See*, *e.g.*, *Griffin v. Peale*, No. CV 17-01153 JGB, 2018 WL 5117555, at **5-6 (C.D. Cal. Jan. 18, 2018) (granting motion to dismiss based on lack of plausible access allegations); *Fillmore v. Blumhouse Prods, LLC*, No. 2:16-cv-04348-AB, 2017 WL 4708018, at *4 (C.D. Cal. July 7, 2017) (same);

19

*Hayes v. Keys*, No. CV 14-62426 PA, 2015 WL 12734010, at *2 (C.D. Cal. Jan. 7, 2015) (same).

> **2.    Neither *Avatar* Nor *Taken* Is Substantially Similar To Plaintiff's Screenplay.**

Even assuming access, a copyright plaintiff must demonstrate that a defendant copied "enough of the plaintiff's expression of [his] ideas or concepts to render the [underlying] works 'substantially similar.'" *Rentmeester*, 883 F.3d at 1117. Plaintiff's Complaint insisted that two completely dissimilar works—*Avatar* and *Taken*—both copy Plaintiff's screenplay. This, of itself, belies Plaintiff's claim. Two fundamentally different works cannot be copied from a single preexisting work. The stark differences between all three works are evident even at a cursory review. The works are not even superficially similar. In short, even if Plaintiff had adequately alleged access, the motion to dismiss was properly granted for the entirely independent reason that there was no substantial similarity between the works at issue.

This Court applies an "extrinsic" and an "intrinsic" test for assessing substantial similarity. The extrinsic test can be determined as a matter of law. *Funky Films*, 462 F.3d at 1077; *Benay*, 607 F.3d at 624.[10] The extrinsic test

---

[10] Plaintiff is not entitled to expert discovery on the issue of substantial similarity, as he argues, *see* AOB at 36, because "this case does not involve a highly technical area of expertise"; rather, "this case involves the comparison of a [plaintiff's] film script to" Defendants' expressive works. *See Bernal v. Paradigm Talent &*

"assesses the objective similarities of the two works, focusing only on the

protectable elements of the plaintiff's expression." *Rentmeester*, 883 F.3d at 1118

(citing *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002)). The

"protectable elements" requirement means that courts exclude broad ideas, basic

and unoriginal concepts, and *scènes à faire* from the analysis. As the court

explained in *Berkic*, "No one can own the basic idea for a story. General plot ideas

are not protected by copyright law; they remain forever the common property of

artistic mankind." 761 F.2d at 1293. A court applying the extrinsic test must

review the works at issue to determine if they are substantially similar based on

"articulable similarities" in "plot, themes, dialogue, setting, pace, mood,

characters, and sequence of events." *Funky Films*, 462 F.3d at 1077.

---

*Literary Agency*, 788 F. Supp. 2d 1043, 1062 (C.D. Cal. 2010); *see also Campbell*, 718 F. Supp. 2d at 1112 (granting motion to dismiss based on lack of substantial similarity on pleadings and underlying works alone). "There is no authority for th[e] proposition" that expert testimony is valid in guiding the extrinsic test analysis; indeed, "courts routinely disregard expert testimony in conducting the extrinsic test." *Shame on You Prods., Inc. v. Banks*, 120 F. Supp. 3d 1123, 1147 (C.D. Cal. 2015). Plaintiff's cited cases do not mandate or even encourage expert testimony at the pleadings stage. *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1164 (9th Cir. 1977), states that expert testimony in a copyright case can sometimes be "appropriate," but more commonly, courts analyze substantial similarity and "this question may often be decided as a matter of law." *Id.* Moreover, the experts used in *Skidmore* testified about musical composition, a specialized subject matter about which laypersons are unfamiliar. 952 F.3d at 1076-1078. *Skidmore* does not state that a copyright plaintiff is entitled to an expert witness in every context or where, as here, substantial similarity is resolvable at the pleadings stage.

Here, *Butterfly Driver* is not remotely similar to *Avatar* or *Taken,* and it is far less similar to these films than the works at issue in the cases discussed above, where courts found no substantial similarity as a matter of law.

        **a.**     **Plaintiff's Alleged Similarities Only Consist Of Unprotectable Elements Which Must Be Filtered Out From The Substantial Similarity Analysis.**

The first step in a substantial similarity analysis is to filter out from plaintiffs' work unprotectable components such as broad ideas, concepts, and *scènes à faire*, *Berkic,* 761 F.2d at 1293, leaving only the "expression[s] . . . that display the stamp of the author's originality." *Harper & Row Publ'rs, Inc. v. Nation Enters.*, 471 U.S. 539, 547 (1985). A smattering of "random similarities scattered throughout works are insufficient" to constitute substantial similarity. *Schkeiban*, 2012 WL 5636281, at *2 (dismissing infringement claim involving *Avatar*). Plaintiff repeatedly refers to generic elements that appear in countless films, television programs and other works of fiction, including: a hero as a "visionary dreamer" (AOB at 28); environmentalism or pollution as a concern (AOB at 28); a hero with healthcare-related goals (AOB at 28); the concept of a hero nearly dying, but being saved by a secondary hero (AOB at 29); corporations and the "heartless government" serving as a story's villains (AOB at 32); "divisive social issues" (AOB at 30); car chases (AOB at 25); animals joining in an action sequence (AOB at 30); and an overall mood that is "very dark, with a hopeful

ending" (AOB at 31). Plaintiff also claims that he is the inventor of generic themes which *Avatar* and *Taken* supposedly infringe, including the "primacy of family," the "importance of respecting and protecting the environment," and the "horror of corporate greed." AOB at 17; 1-SER-0070. None of these are protectable, and they may not be considered in applying the extrinsic text. *Rentmeester*, 883 F.3d at 1118 (affirming grant of motion to dismiss after filtering out stock elements).

After filtering out unprotectable elements, an analysis of the "plot, themes, dialogue, mood, setting, pace, characters, and sequence of events" shows that *Butterfly Driver* is not in any way substantially similar to either *Avatar* or *Taken*. *See Rentmeester*, 883 F.3d at 1118 (internal brackets omitted).

### b. *Avatar* Is Not Substantially Similar To *Butterfly Driver*.

***Plot and Sequence of Events.*** *Avatar* and *Butterfly Driver* tell completely different stories. *Avatar* is about a young, single and childless man who is sent to work on an alien moon, in a distant galaxy, as part of a mining operation to enrich a greedy Earth-based corporation. He physically transforms into an alien through the use of a genetically-engineered alien body (his avatar), falls in love with another alien, and helps save the moon from destruction at the hands of the corporation.

In contrast, *Butterfly Driver* is about a man who is wrongly accused of a crime, then escapes state custody, eventually goes on a mission to find medicine for his sick child (not to save the environment) and destroys a satellite city controlled by a corrupt politician. The central plot points of *Butterfly Driver* simply do not appear in *Avatar*. Plaintiff attempts to suggest otherwise by arguing that both involve a journey to find adequate healthcare. AOB at 32. First, this purported plot point is not even part of the works at issue, but even if it were, this allegation cannot support a finding that the plots are substantially similar. *See Carlini*, No. 2:19-cv-8306, at *16 (observing that plaintiff's "breadth of the description" of the plots of the works at issue "cannot mask the distinctions between the two scripts"). In addition, the Complaint specifically noted, and the works themselves readily demonstrate, the lack of any romantic storyline in *Butterfly Driver* (1-SER-0095), while *Avatar*'s romantic story is a key component of the entire film. The Complaint also stressed the "unique" element of *Butterfly Driver*'s hero being "focused on his kids and being a good father," but the hero in *Avatar* has no children. *See id.*

Likewise, the main plot points of *Avatar* do not appear in *Butterfly Driver*. There is no interaction between humans and an alien race in *Butterfly Driver*, and there is no use of avatars to allow humans to engage in such interaction. Plaintiff's allegations of similarity between *Butterfly Driver* and *Avatar* hinge on his

contention that they share in common the idea of a war veteran-hero embarking on a mission related to environmentalism. *See* 1-SER-0071. That general idea is not protected by copyright – nor is the purported "environmentalist goal" in *Butterfly Driver* clear in the screenplay itself. *See id.* Even assuming that idea were present in *Butterfly Driver*, it still could not support a finding of substantial similarity. *See Funky Films*, 462 F.3d at 1078 (finding no substantial similarity where "[a]side from [a] rather uneventful [alleged] similarity," "the plots of the two stories develop quite differently"). Plaintiff's argument on appeal that "[v]irtually every plot structure" in *Avatar* is taken from *Butterfly Driver* is grossly inaccurate even upon a cursory reading of the works themselves. *See* AOB at 32.

Even if an environmentally-minded hero could be considered a common element, the Ninth Circuit has declined to find substantial similarity where two works share an even more specific premise, but tell their stories differently. *See, e.g.*, *Benay*, 607 F.3d at 625 (finding no substantial similarity despite the fact both works "share[d] the . . . premise of an American war veteran going to Japan to help the Imperial Army by training it in the methods of modern Western warfare"). Here, the concept of a hero taking on a powerful, industrial villain with references to environmentalism has been the subject of numerous films pre-dating Plaintiff's script, including *The Fifth Element* (1997 science-fiction/adventure film where a taxicab driver hero needs to help save an environmentally damaged future Earth),

25

*Silkwood* (1983 film about a nuclear whistleblower and union activist heroine), *A Civil Action* (1998 film about a real-life court case involving environmental pollution), and *The Matrix* (1999 science-fiction/action film about a ravaged Earth where a human is unknowingly trapped inside a simulation run by an evil enterprise), among many others.

   ***Themes.*** The works are also thematically dissimilar. "A work's theme is its overarching message," *Silas v. HBO*, 201 F. Supp. 3d 1158, 1180 (C.D. Cal. 2016) (*aff'd*, 713 Fed. App'x 626), and "general similarities between [] themes, such as saving the world or battles between good and evil are not subject to copyright" protection, *Schkeiban*, 2012 WL 5636281, at *2. Plaintiff argues that *Butterfly Driver* and *Avatar* share common themes of the "primacy of family," "the horrors of corporate greed," the dangers of a toxic/polluted environment, spirituality, racism and healthcare. *See* AOB at 28. Even if these broad topics could be considered themes, what matters is that *Avatar* and *Butterfly Driver* send different messages. *Butterfly Driver* is at its core an action-adventure story with no real theme at all. It presents a series of physical perils and dangers from which the protagonist must escape. *Avatar*, on the other hand, presents themes of romantic love and interconnectedness of different species, neither of which are present in *Butterfly Driver*. While *Butterfly Driver* on occasion makes a passing reference to pollution on Earth, a constant and recurring theme of *Avatar* is the importance of

nature and the contrast between those who seek to exploit the environment for commercial gain and those who find peace and contentment enjoying nature's beauty and grandeur.

***Dialogue.*** "[E]xtended similarity of dialogue [is] needed to support a claim of substantial similarity." *Olson v. Nat'l Broadcasting Co.*, 855 F.2d 1446, 1450 (9th Cir. 1988). Neither Plaintiff's Opening Brief nor his Complaint point to any specific or unique dialogue from *Butterfly Driver* that is used in *Avatar*, and instead they only vaguely reference characters using similar words to discuss their beliefs and vocations. *See* AOB at 30-31; *see also*, *e.g.*, 1-SER-0089 (alleging that *Butterfly Driver* uses the phrase "**earns** a soul in this life," and *Avatar* uses the phrase "**earn** your place among the people forever") (emphasis in Complaint); 1-SER-0089-0090 (alleging that the works use similar "post 9-11 slogans" where a character in *Butterfly Driver* says "I don't negotiate with State enemies," and a character in *Avatar* says "we're going to fight terror with terror"). These phrases are obviously not identical, and anyway, short stock phrases like these do not constitute substantial similarity between two long works' dialogue. *Corbello v. Valli*, 974 F.3d 965, 971 (9th Cir. 2020) (no copyright infringement where alleged similarities were based in "common phrases" and other *scènes à faire*); *Marcus*, 279 F. Supp. 3d at 1069 (two-word phrase of "being black," "used once in each work . . . can in no way be construed as 'extended similarity of dialogue'");

*Carlini*, No. 2:19-cv-8306, at *22 (common usage of "ordinary words and phrases" does not indicate substantial similarity). Plaintiff's contentions regarding similarity in dialogue are nowhere near the required "extended similarity of dialogue" for a finding of substantial similarity. *Olson*, 855 F.2d at 1450.

    ***Mood.*** *Avatar* and *Butterfly Driver* also differ in the moods they convey. Courts often look to overall tone, tendencies toward lightness or darkness, and pervasive elements to define a story's mood. *See Shame on You Prods.*, 120 F. Supp. 3d at 1158 ("pace[]" and "genre" affect a story's mood). *Butterfly Driver* is an action/science-fiction/noir story involving state-sanctioned murder, wrongful imprisonment, and class divisions across different "zones" on Earth. In contrast, *Avatar* is a fantasy/romance/action film involving harmony with nature, advanced technology, and interspecies relations with a humanoid alien clan. These differences create distinct moods. *See Shame on You Prods., Inc.*, 120 F. Supp. 3d at 1158 ("general mood . . . flows naturally from unprotectable basic plot premises"). Whereas *Butterfly Driver* involves a series of violent physical struggles and dangers throughout the story, *Avatar* focuses for long stretches on the protagonist's exploration of the Pandoran jungle, his increasing level of communion with nature, and his burgeoning relationship with and eventual love for Neytiri. A comparison of the actual works belies Plaintiff's conclusory and inaccurate assertion that the two works have "identical" moods. *See* AOB at 31.

***Setting.*** Plaintiff's Opening Brief makes no argument regarding similarity of the works' settings, and his Complaint actually concedes that "[t]he setting on Pandora is very different from [*Butterfly Driver*]." 1-SER-0085. Indeed, it is. *Avatar* is set on Pandora, a fictional moon teeming with jungle landscapes, floating mountains, waterfalls, and bioluminescent flora and fauna. *Butterfly Driver* is set on Earth, with portions also taking place on Uberopolis, an urban satellite dominated by a prison. The settings are completely distinct. Another court, already having analyzed the setting in *Avatar*, found no similarity to the plaintiff's work even where it featured "a planet away from Earth . . . homes made in the trees . . . and [] space ships [from] Earth." *Van*, 2011 WL 13121345, at \*3. The settings at issue in *Van* were far more similar than the settings here; *Butterfly Driver* does not feature travel to a celestial body populated by an alien race in another galaxy, the primary setting of *Avatar*. The general concept of settings in space—and more specifically in *Van*, a "beautiful planet filled with many colors"—is unprotectable *scènes à faire*. *Id.*

***Pace.*** *Butterfly Driver* and *Avatar* sharply diverge in terms of pace. *See Campbell*, 718 F. Supp. 2d at 1115 ("[t]he time period within which a movie is set is a factor for determining the pace of the movie"). *Butterfly Driver*'s pace is characterized by spikes of action mixed with minimal downtime: people are killed by bounty hunters; Arlo travels to New York, sees his children and meets Tamara,

29

and then goes to Los Angeles where he is ambushed by police; Arlo is sent to prison in Uberopolis for four months and then escapes; he returns to Earth, sees his children again, and then goes back to Uberopolis; Arlo fights with Drexler and narrowly avoids a missile before Uberopolis is destroyed. In *Avatar*, the primary pace is pastoral, calm and contemplative until the end. Jake discovers Pandoran nature and the Na'vi way of living as he slowly falls in love with Neytiri and earns the respect of her family. Only at the end of *Avatar* is there a fast-paced battle sequence; in contrast, *Butterfly Driver* contains scenes of quick pacing and sudden violence from the beginning of, and throughout, the screenplay.

**Characters.** After filtering out the unprotectable elements of *Butterfly Driver* and *Avatar*, the characters bear no resemblance to one another. To receive copyright protection, characters must be "especially distinctive" and "contain some unique elements of expression." *DC Comics v. Towle*, 802 F.3d 1012, 1021 (9th Cir. 2015); *see also Van*, 2011 WL 13121345, at *3 (no substantial similarity of characters where "[a]side from the very general similarities . . . there are many important differences between the characters in the two works"). Characters with ostensible surface-level similarities are not substantially similar where they also "have noticeable differences." *Silas*, 201 F. Supp. 3d at 1177.

The works' protagonists, Arlo and Jake, are not remotely similar. Plaintiff argues that Arlo is ex-military, a "visionary dreamer," disabled, motivated by

healthcare-related goals, has a sense of spirituality, and lives in a dystopian Earth. *See* AOB at 28; 1-SER-0071-0072. These generic concepts are unprotectable. *See Berkic*, 761 F.2d at 1293 (such concepts are the "common property of artistic mankind"). Moreover, Arlo and Jake are not at all similar. Arlo is married with children, and finding medicine for his daughter serves as his primary motivation. Jake is not married and has no children. He starts the film with the goal of reversing his paralysis, but by the end, he has abandoned that goal in favor of a life on Pandora. Jake learns from the Na'vi way of life, but there is no indication that he is a "visionary dreamer" or has a particular sense of spirituality. Plaintiff points out that Arlo lives in a dystopian Earth, AOB at 28, but Jake, in *Avatar*, spends virtually no time on Earth, much less on a dystopian Earth. Even the characters' purported disabilities are different: Arlo suffers from occasional severe headaches, but Jake is a paraplegic. *See* AOB 32; 1-SER-0071-0072. There are no protectable similarities between the protagonists of *Butterfly Driver* and *Avatar*.

Drawing similarities between other characters in the stories is an apples-to-oranges exercise. Plaintiff claims that there is an elitist corporate villain (AOB at 32) as well as a female scientist (*see* AOB at 30-31) in both stories, but these are generic elements. Sharing the same background or occupation does not make characters substantially similar. *See Carlini*, No. 2:19-cv-8306, at *20 (descriptions of two characters as "polite and likeable bartenders who stand out

from the other sexist and misogynistic men" who are "raising a young male family member on their own" were "general attributes[,] [in]sufficient to make the character protectable"); *Flaherty v. Filardi*, No. 03 Civ. 2167, 2009 WL 749570, at *16 (S.D.N.Y. Mar. 20, 2009) ("Although both draft screenplays have an attorney protagonist . . . the attorneys are very different"). In addition, the *Butterfly Driver* screenplay includes references to many apparently transitory characters with no analog to characters in *Avatar*—for example, Jerry the federal investigator, Arlo's wife and children, and a fellow prisoner Arlo befriends on Uberopolis. And perhaps most important of all, the central characters in *Avatar*—the Na'vi—find no parallel in *Butterfly Driver*. There are no alien creatures in *Butterfly Driver*— much less ten-foot-tall, blue humanoids with tails, who have their own language, and around whom the story revolves.

In short, not one of the objective elements required to satisfy the extrinsic test for substantial similarity is present in *Avatar* and *Butterfly Driver*. Plaintiff's copyright claims based on *Avatar* fail as a matter of law.

### c. *Taken* And *Butterfly Driver* Are Also Not Substantially Similar.

*Plot and Sequence of Events.* The plot of *Taken* bears no resemblance to that of *Butterfly Driver*. As with *Avatar*, Plaintiff's contentions of similarity between *Butterfly Driver*'s and *Taken*'s plots describe only unprotectable

commonalities, including a hero "using his phone and GPS" to solve problems, sequences of car chases, and a mission to save a daughter. *See* AOB at 22-26; 1-SER-0093-0104. But much different from *Butterfly Driver*, *Taken* features an unrelenting, action-driven plot and sequence of events. It tells the story of a father's mission to rescue his kidnapped daughter from a human trafficking ring, and the horrors of human trafficking necessarily dictate the story's plot. The protagonist's daughter is kidnapped early in the film, and the action advances forward from that point on, depicting a straightforward rescue mission.

In contrast, *Butterfly Driver*'s plot meanders. First, Arlo accepts a risky job for money to help his family escape from bounty hunters. Then he is wrongly accused of a crime and spends months in jail. After escaping, he learns the severity of his daughter's illness, and then he seeks medicine for her. That both protagonists embark on missions to save their daughters (AOB at 26; 1-SER-0101), is a generic similarity containing no protectable expression. Additionally, the protagonists help their daughters in completely different ways: *Taken* features a rescue from human trafficking, while in *Butterfly Driver* the protagonist seeks to obtain a rare medication. The overall plots and sequences of events are distinct, and the details of the missions are profoundly different. Moreover, a parent's motivation to save and protect a child is among the most universal motivations

imaginable and is featured in many films that pre-date Plaintiff's script.[11]
Disregarding the "uneventful similarit[ies]" of the stories, they feature "quite
different[]" plots. *Funky Films*, 462 F.3d at 1078.

       ***Themes.*** *Butterfly Driver* and *Taken* have completely disparate themes.
*Butterfly Driver*'s message is about Arlo's victory over a greedy political villain,
with occasional references to the harmful nature of societal divides and pollution
on Earth. In contrast, *Taken*'s message is laser-focused: a parent will use every
skill, resource, and method imaginable to rescue a kidnapped child. Plaintiff
attempts a comparison by pointing out that Bryan causes some destruction in Paris
on his path to save his daughter, and that Arlo completely destroys Uberopolis,
AOB at 25; 1-SER-0100, but while Bryan happens to leave behind a path of
mayhem, Arlo's escape from Uberopolis results in its total destruction by a
missile.[12] Plaintiff also argues that the works have similar themes including "the
primacy of family," "the virtue of character," and "immigration," (AOB at 26), but
crucially, the works do not share any "overarching message." *Silas*, 201 F. Supp.

---

[11] For example, *Ransom* (1996 film about parents' quest to rescue a kidnapped
child); *Not Without My Daughter* (1991 film about a woman rescuing her daughter
from child marriage and conscription); *Man On Fire* (2004 action-thriller film
about an officer-turned-bodyguard who goes on a rampage to save a nine-year-old
child).

[12] The imagery of a trail of destruction is not at all uncommon in action films, and
has been depicted in many films, for example: *Independence Day* (1996);
*Terminator 2: Judgment Day* (1991); and *Blade Runner* (1982).

3d at 1180. *See also Bissoon-Dath v. Sony Computer Entmn't Am., Inc.*, 694 F. Supp. 2d 1071, 1083 (N.D. Cal. 2010) (finding a dissimilar theme in part because "[w]hile violence is not absent from plaintiffs' works, it lacks the thematic centrality and intensity seen in [defendant's work]").

*Dialogue.* The two works have nothing close to the "extended similarity of dialogue" "needed [for] substantial similarity," *Olson*, 855 F.2d at 1450, nor does Plaintiff's Opening Brief point to any actual commonalities in dialogue. Instead, it only grasps at short, generic snippets of purportedly similar dialogue. *See*, *e.g.*, AOB at 27 (arguing that characters in both *Butterfly Driver* and *Taken* refer to the government as "the state"); AOB at 24-25 (noting references in the dialogues of *Butterfly Driver* and *Taken* to "paranoia" or being "paranoid"). *See Marcus*, 279 F. Supp. 3d at 1069.

*Mood.* Plaintiff describes *Butterfly Driver*'s mood as "very dark, with a hopeful ending." AOB at 31. Aside from this being highly generalized, it is also not particularly descriptive of the work itself. *See Shame On You Prods.*, 120 F. Supp. 3d at 1158 (no substantial similarity with respect to mood where both works were "light-hearted comedies"). In *Butterfly Driver*, protagonist Arlo spends a prolonged period in jail, finds time to pause and reflect, befriends people, and even connects with a dolphin. In contrast, *Taken*'s Bryan seemingly forgos sleep for days and rarely connects with anyone else during his supercharged quest to find his

35

daughter.  This contributes to *Taken* having an overall darker, more intense mood than *Butterfly Driver*.  *See Carlini*, No. 2:19-cv-8306, at *21 (observing that "darker" scenes in one work contributed to a different mood than the allegedly infringing work, despite the two being generally part of the same genre).

      ***Setting.***  Plaintiff makes no arguments about similarity of the settings, and none can be drawn from the works.  *Butterfly Driver* takes place in a futuristic, post-societal United States and an orbiting satellite city; whereas *Taken* is set primarily in present-day Los Angeles and Paris.

      ***Pace.***  The paces of *Butterfly Driver* and *Taken* are also fundamentally different.  The pace of *Butterfly Driver* encompasses several months, whereas the entire plot of *Taken* occurs over a few days.  *See Campbell*, 718 F. Supp. 2d at 1115 (explaining that the span of time a story covers determines pace).  Plaintiff argues that both stories involve a time constraint, but the concept of a fixed amount of time is an unprotectable element which must be filtered out.  *See* AOB at 27. *Rentmeester*, 883 F.3d at 1118 (finding no substantial similarity after filtering out stock elements).  A fast pace is stock for the thriller genre, but genres are not protectable.  *See Shame on You Prods*, 120 F. Supp. 3d at 1155; *Rice*, 330 F.3d at 1177 (observing that there are only a "finite number of ways" to portray a general concept, and accordingly, such portrayals are not a basis for finding substantial similarity).

***Characters.***  The characters of Arlo and Bryan have no protectable similarities in common.  Plaintiff argues a variety of inconsequential, surface-level similarities, such as being middle-aged, being ex-military, living alone and being divorced or separated, being "masculine," thinking clearly under pressure, and being devoted to their children.  AOB at 21-22.  But these only add up to a general archetype for which copyright protection is not given.  *See*, *e.g.*, *Basile v. Sony Pictures Entmn't, Inc.*, No. CV 14-04264, 2014 WL 12521344, at *6 (C.D. Cal. Aug. 19, 2014) ("archetypes . . . such as a 'blonde, blue-eyed hero,' [] are thus not 'distinctive' enough to be protectable"); *Fulks v. Knowles-Carter*, 207 F. Supp. 3d 274, 290 (S.D.N.Y. 2016) (the concept of an "ominous figure" is unprotectable).  The main characters in *Taken* and *Butterfly Driver* are very different.  Bryan eschews any help in *Taken* while carrying out his mission of finding his daughter, whereas Arlo's greatest success comes through collaboration with his former enemy, Jerry.  Much of Bryan's character development in *Taken* is driven by his inability to understand his teenage daughter, an attribute which has no analogue in Arlo's relationship with seven-year-old Franny.  Plaintiff also makes much of Arlo's central disability (his recurrent headaches) with respect to *Avatar*, *see* AOB at 32, but this quality of Arlo contrasts with Bryan, who seems nearly invincible.

The only other character in *Taken* from which Plaintiff tries to draw comparisons is Bryan's daughter, Kim.  AOB at 26; 1-SER-0101.  Plaintiff argues

that both Kim and the daughter in *Butterfly Driver*, Franny, have a young "spirit," though he acknowledges that Franny is seven years old, whereas Kim is seventeen. AOB at 26. But the general concept of a daughter is not remotely unique, and cannot serve as a basis for finding substantial similarity.

*Butterfly Driver* includes several characters for which *Taken* has no counterparts. Unlike Drexler's extended presence and developed backstory in *Butterfly Driver*, the villains in *Taken* are mostly amorphous, undeveloped characters with no story beyond their nefarious involvement in human trafficking. And there is no analog in *Taken* for Jerry, the federal-investigator-turned-ally to the protagonist. *See Funky Films*, 462 F.3d at 1078-1079 (finding no character similarity where several characters had "no counterpart" in the plaintiff's work).

*　　*　　*

Courts regularly find no substantial similarity as a matter of law even where the underlying works share far more in common than the works here. For example, in *Funky Films*, 462 F.3d at 1081, the court declined to find substantial similarity where both works included general plot ideas involving a "family-run funeral home, the father's death, and the return of the 'prodigal son,' who assists his brother in maintaining the family business." In *Carlini*, 2:19-cv-8306 (C.D. Cal. Feb. 2, 2021), the court found no substantial similarity between a film and screenplay, both of which were romantic comedies about a woman who gains the

38

ability to hear men's thoughts after being hit on the head and hospitalized. In *Marcus*, 279 F. Supp. 3d at 1066, the court observed that "[w]hile both works involve African American families living in predominately white areas, the concrete elements of the two works are not substantially similar." The court in *Olson*, 855 F.2d at 1450, held that there was no substantial similarity between two works depicting "group action-adventure series designed to show Vietnam veterans in a positive light." In *Cavalier*, 297 F.3d at 824, the court agreed with defendants that there was no protection for the "general premise of a child, invited by a moon-type character, who takes a journey through the night sky and returns safely to bed to fall asleep." In *Benay*, 607 F.3d at 625, the court found no substantial similarity despite the fact that both works "share[d] the historically unfounded premise of an American war veteran going to Japan to help the Imperial Army by training it in the methods of modern Western warfare for its fight against a samurai uprising." And in *Berkic*, 761 F.2d at 1293, the court found no substantial similarity among works describing "criminal organizations that murder healthy young people, then remove and sell their vital organs to wealthy people in need of organ transplants."

Neither *Avatar* nor *Taken* is substantially similar to *Butterfly Driver*. Indeed, *Avatar* and *Taken* are not remotely similar to one another, and so it is illogical that they could both be derived from the same screenplay. As a matter of law and in light of the above, Plaintiff's copyright claims were properly dismissed

with prejudice. *Campbell*, 718 F. Supp. 2d at 1116 (lack of substantial similarity cannot be cured by amendment).

> **3.** **The District Court Did Not Err With Respect To The "Selection And Arrangement" Test.**

Plaintiff cannot save his copyright claims based on his purported "selection and arrangement" of elements. *See* AOB at 35-36. Plaintiff cites *Skidmore*, 952 F.3d at 1074, for the proposition that copyright law can extend to unprotectable elements when they are selected and arranged in a unique way. Putting aside the fact that *Skidmore* is a musical composition case, and therefore has no application here, even if "selection and arrangement" protection could override the need for substantial similarity – which it cannot, as discussed in more detail below – such protection applies "only if those elements are numerous enough and their selection and arrangement original enough that their combination constitutes an original work of authorship." *Id.* The so-called "selection and arrangement" test protects "the *particular* way in which the artistic elements form a coherent pattern, synthesis or design," and "only the '*new* combination,' that is the '*novel* arrangement,' and not '*any* combination of unprotectable elements . . . qualifies for copyright protection.'" *Id.* at 1075 (emphases and ellipses in original; citation omitted).

In *Skidmore*, the court rejected the plaintiff's attempt to recast its musical composition as constituting a unique "selection and arrangement" deserving of protection. *Id.* at 1074-76. The court held that a plaintiff cannot simply invoke the words "selection and arrangement" and point to "disparate categories of unprotectable elements" in order to establish copyright protection: "Labeling them a 'combination' of unprotectable elements does not convert the argument into a selection and arrangement case." *Id.* at 1075. Even "[p]resenting a combination of unprotectable elements without explaining how these elements are particularly selected and arranged amounts to nothing more than trying to copyright commonplace elements. Without such arrangement, there is no liability for taking ideas and concepts from the plaintiff's work, even in combination." *Id.* (citations and internal quotation marks omitted).

Plaintiff did not specifically rely on "selection and arrangement" in his Complaint, though he confusingly and unsuccessfully attempts to invoke it now. *See generally* 1-SER-003-0144; *see also* 1-ER-28.[13] He claims that the district

---

[13] Plaintiff also fails to cite any authority, and it is not apparent from copyright case law, that the concept of "selection and arrangement" applies to fictional film scripts. The potential application of such a theory of copyrightability is geared more toward elements such as naturally-occurring flora and fauna, "factual" arrangements in a photograph ("subject matter, pose, camera angle, etc."). *See*, *e.g.*, *Satava v. Lowry*, 323 F.3d 805, 812 (9th Cir. 2003) (discussing glass sculptor's copyright protection in a particular "arrangement" of hues and shapes in depicting a natural element, jellyfish); *L.A. Printex Indus., Inc. v. Aeropostale, Inc.*, 676 F.3d 841, 850-851 (9th Cir. 2012) (finding copyright

court "had a duty to request Plaintiff's selection and arrangement **theory**," without citing any case where a district court has "request[ed]" a "theory" from any party (whatever that might mean). *See* AOB at 35 (emphasis in original). In any event, Plaintiff has not met the high bar of establishing a "novel arrangement" of sufficiently "numerous" unprotectable elements into a "particular" "new combination" that amounts to an original "selection and arrangement." *Skidmore*, 952 F.3d at 1074-75. Plaintiff's vague, general and admittedly "unprotectable elements," AOB at 35, are insufficient to support a "selection and arrangement argument." *Skidmore*, 952 F.3d at 1074-75. As in *Skidmore*, Plaintiff's argument "amounts to nothing more than trying to copyright commonplace elements." *Id.* at 1075.

Moreover, many pre-2005 films depict the same elements that Plaintiff falsely asserts he was the "first" to create, contradicting Plaintiff's contentions about the purportedly "unique" selection and arrangement of *Butterfly Driver*, created in 2005. *E.g.*, *Waterworld* (1994 science fiction/action-adventure film depicting protagonist on future Earth ravaged by global climate change), *The Fifth*

---

protection in pattern containing "original selection, coordination, and arrangement" of naturally-occurring elements of open flowers and closed flower buds). In contrast, a fictional film script's creative expression comes from its telling of a story, not the arrangement of common natural or factual elements in a novel way. *See Warner Bros. Pictures v. Columbia Broadcasting System*, 216 F.2d 945, 950 (9th Cir. 1954) (copyright protection for a film is in the "story being told").

*Element* (1997 science-fiction/adventure film where a taxicab driver hero needs to help save an environmentally damaged future Earth), *Crash* (2004 film portraying primary characters, including working class persons, confronting racial, cultural and immigration conflicts, inequalities and injustices), *As Good As It Gets* (1997 film about primary characters, a waitress and an artist, confronting inequities in the healthcare industry), *Do The Right Thing* (1989 film depicting primary characters confronting economic/social inequality and racial/cultural conflict), *Silkwood* (1983 film about a nuclear whistleblower and union activist heroine), *Matewan* (1987 film about coal mine worker heroes confronting union breakers), *Die Hard* (1988 action film featuring a working-class hero), *Not Without My Daughter* (1991 film about a woman rescuing her daughter from child marriage and conscription), *Ransom* (1996 film about parents' quest to rescue a kidnapped child), and *Finding Nemo* (2003 animated adventure film depicting a father's action-packed quest to rescue a child).

Besides the lack of a viable "selection and arrangement" argument from Plaintiff, *Skidmore* makes clear that even where a plaintiff has demonstrated a potentially protectable "selection and arrangement," he still must demonstrate substantial similarity: "The standard is always substantial similarity. Of course the degree of overlap in original expression that is required for the similarity to be substantial is determined by the range of possible protectable expression." 952

43

F.3d at 1076 n. 13. This Court went on to explain that "[m]ore similarities are required to infringe if the range of protectable expression is narrow, because the similarities between the two works are likely to cover public domain or otherwise unprotectable elements." *Id.* A plaintiff "cannot establish substantial similarity by reconstituting the copyrighted work as a combination of unprotectable elements and then claiming that those same elements also appear in the defendant's work, in a different aesthetic context." *Id.* at 1075. Thus, even a copyright claim based on "selection and arrangement" needs to satisfy this Court's substantial similarity tests, which includes the extrinsic and objective comparison of protectable elements. As established in Section VI.A.2, *supra*, the test is not satisfied here.

Plaintiff's reliance on *Skidmore* for a "selection and arrangement" argument is completely misplaced. *See* AOB at 35. *Skidmore* simply reaffirms that Plaintiff still needs to adequately allege access by Defendants (which he has not done), and he still needs to show substantial similarity pursuant to the extrinsic test, which he fails to do as a matter of law.

### 4. Plaintiff's Other Piecemeal Arguments Cannot Change The Unavoidable Conclusion That The Works At Issue Lack Substantial Similarity As A Matter Of Law.

Plaintiff makes a host of additional unsupported arguments to try to distract from the fatal deficiencies in the Complaint, but none have any merit. Plaintiff claims, alternatingly, that the district court "omit[ted]" a portion of the *Butterfly*

44

*Driver* script without identifying that portion (AOB at 17-18); that the district court improperly considered differences among the works instead of similarities (*see id.* at 17, 40); that a different extrinsic test standard should be used for corporations versus individuals[14] (*see id.* at 17-18); and that *Butterfly Driver* must have been infringed because it is "unprecedented, in originality, scale, and creativity," as compared with works like *Star Wars* and *Battlestar Galactica*, which Plaintiff calls "generic" and "comically simple."[15]  AOB at 18-19.

The district court's well-reasoned decision carefully reviewed the three works at issue and determined that Plaintiff could not demonstrate substantial similarity as a matter of law.  1-ER-12-14.  Other than being displeased with the district court's finding, he provides no substantive argument for how the district court looked to differences rather than similarities.  And when analyzing works as dissimilar as these three, observations of their differences will necessarily

------

[14] Along with this unsupported claim, Plaintiff also argues that he is entitled to (but did not receive) "broad" protection for his work.  AOB at 41.  But the only case he cites for this point (*L.A. Printex Industries, Inc.*, 676 F.3d 841) was about fabric designs, and Plaintiff makes no attempt to analogize it to his facts.  Plaintiff identifies neither the reasons he is entitled to "broad" protection (other than vaguely asserted high levels of originality), nor the ways the district court did not apply broad protection.

[15] Citing *Twentieth-Century Fox Film Corp. v. MCA, Inc.*, 715 F.2d 1327 (9th Cir. 1983) ("*MCA*"), but *MCA* explicitly notes that summary resolution of copyright claims is "appropriate where works are so dissimilar that a claim of infringement is without merit."

predominate over purported similarities in any objective assessment.  Moreover,

looking to differences is one of the keys to conducting a substantial similarity

analysis.  *See Funky Films*, 462 F.3d at 1078 (recognizing while "[a]t first blush,

th[e] apparent similarities in plot appear significant," "an actual detailed reading of

the two works reveals greater, more significant differences and few real

similarities").

Plaintiff's Complaint fails to plausibly allege access or substantial similarity

as matter of law, and the district court's dismissal is proper based on either ground.

## B.     THE DISTRICT COURT ALSO PROPERLY DISMISSED PLAINTIFF'S ANCILLARY CLAIMS.

Plaintiff's ancillary claims for intentional misrepresentation, breach of

contract and breach of confidence were also properly dismissed, and the Court can

affirm the district court's dismissal based solely on the fact that Plaintiff's

copyright claims fail as a matter of law.  As the district court recognized, "[i]t is

implausible that a complex web of intentional misrepresentations, breaches of

contract, and breaches of confidence occurred in concealing the use of [Plaintiff's]

screenplay when there was clearly no copyright infringement that required hiding."

1-ER-14-15.  Courts dismiss ancillary claims like Plaintiff's where there is no

substantial similarity among the underlying works forming the basis of the primary

complaint.  *See*, *e.g.*, *Ryder v. Lightstorm Entmn't Inc.*, 246 Cal. App. 4th 1064,

1074 (2016) (adjudicating contract claims based on success or failure of parallel

copyright claims because the alleged contract "mirrors the touchstone inquiry of 'copying' in copyright cases, which is circumstantially proved by access plus *substantial* similarity") (emphasis in original); *Spinner v. Am. Broadcasting Co.*, 215 Cal. App. 4th 172, 184-185 (2013) (holding that a plaintiff must prove substantial similarity in a breach of contract claim based on an idea submission). The district court observed that Plaintiff's ancillary claims were "frivolous" and "improbable" and ultimately dismissed them on the basis that Plaintiff had failed to allege the necessary elements for each cause of action.  1-ER-14.

Alternatively, Plaintiff's ancillary claims can be dismissed for several other separate and independent reasons.  The Court can affirm the district court's dismissal "on any ground supported by the record," even if not relied on by the district court.  *See*, *e.g.*, *Simo*, 322 F.3d at 610.

### 1.     Plaintiff's Claims Are Time-Barred.

Even if they had any merit, Plaintiff's ancillary claims are all time-barred. The statute of limitations for intentional misrepresentation is three years, *see* Cal. C.C.P. § 338(d), and the statutes of limitation for breach of implied-in-fact contract and breach of confidence claims are two years.  *NBCUniversal Media, LLC v. Superior Court*, 225 Cal. App. 4th 1222, 1230-1231 (2014) (ruling that such claims are "governed by the two-year limitations period set forth in [Code of Civil Procedure] section 339," which applies to "claims based on a contract, obligation

or liability not founded upon an instrument of writing"). Plaintiff alleged that the communications giving rise to his intentional misrepresentation, breach of contract and breach of confidence claims occurred in 2006. 1-SER-0003-0005; 0011; 0136-0137; 0141. The films at issue which are the basis of Plaintiff's ancillary claims were released in 2008 (*Taken*, 1-SER-0094) and 2009 (*Avatar*, 1-SER-0063-0068), respectively. More than a decade passed between the alleged events and Plaintiff's filing of the Complaint. Accordingly, the claims are not timely. Indeed, Plaintiff's Complaint concedes that he was on actual notice of the allegations underlying the claims as early as 2009, but he "did not inquire further" at the time. *See* 1-SER-0007 (admitting that Plaintiff first heard about films that supposedly "sounded strikingly similar to his screenplay" starting in 2009). Those allegations definitively established that the running of the relevant statutes of limitations began in 2009 at the latest. *Doe v. Roman Catholic Bishop*, 189 Cal. App. 4th 1423, 1431 (2010) ("plaintiffs are required to conduct a reasonable investigation after becoming aware of an injury, and are charged with knowledge … that would have been revealed by such an investigation"); *see also Platt Elec. Supply v. EOFF Elec., Inc.*, 522 F.3d 1049, 1058 (9th Cir. 2008) (holding that for fraud claims like Plaintiff's intentional misrepresentation claim, once an "indicia of fraud" is apparent, a party is on "inquiry notice," and the statute of limitations begins to run). The district court's dismissal of Plaintiff's ancillary claims should

be affirmed on this basis even without addressing their substance. *See*, *e.g.*, *Orkin v. Taylor*, 487 F.3d 734, 742 (9th Cir. 2007) (affirming dismissal where claims were clearly time-barred on their face). But, as described below, even on the substantive merits of the claims, dismissal was proper.

### 2. Plaintiff Failed To Allege The Required Elements For His Ancillary Claims.

#### a. The Breach Claims Failed As A Matter Of Law.

The Complaint lacked the necessary allegations to state a claim for breach of contract with respect to Fox and News Corp.[16] Plaintiff's breach of contract claim contained only direct allegations relating to ZGM. *See* 1-SER-0141-0143. Plaintiff attempted to rope Fox and News Corp. into the claim only by asserting that "[News Corp.] and [Fox] . . . helped ZGM create a new secret corporate entity, *Future Service Inc*, which became [News Corp.]'s and [Fox]'s subsidiary," 1-SER-0143 (emphasis in original), which provides no legal basis for a contract claim against Fox and News Corp. The Complaint came nowhere close to stating the required elements for breach of contract as to Fox or News Corp.

Plaintiff similarly made no allegations regarding Fox or News Corp. in his breach of confidence claim. *See* 1-SER-0143. The Complaint failed to allege the

---

[16] Plaintiff does not direct his breach of contract or breach of confidence claims against Lightstorm or Cameron. *See* 1-SER-0138-0143.

required element that a confidence was transmitted to the defendant. *Faris v. Enberg*, 97 Cal. App. 3d 309, 324 (1979) (breach of confidence claim fails without evidence of transmission of material from plaintiff to defendant in confidence). This claim therefore failed for the same reasons as the breach of contract claim.

### b. The Intentional Misrepresentation Claim Also Failed.

An intentional misrepresentation claim has the following elements: (1) a misrepresentation, (2) with knowledge of its falsity, (3) with the intent to induce another's reliance on the misrepresentation, (4) actual and justifiable reliance, and (5) resulting damage. *See Alliance Mortgage Co. v. Rothwell*, 10 Cal. 4th 1226, 1239 & n.4 (1995). A claim for intentional misrepresentation "sound[s] in fraud and thus must be pled with particularity under Federal Rule of Civil Procedure 9(b)." *Monreal v. GMAC Mortg., LLC*, 948 F. Supp. 2d 1069, 1077-1078 (S.D. Cal. 2013). Plaintiff did not allege the existence of any of these elements with respect to Defendants—much less with the requisite particularity.

Plaintiff's Complaint alleged various communications he had with ZGM, including that he submitted the *Butterfly Driver* script to ZGM and the agency "said they would contact Plaintiff if they intended to use Plaintiff's ideas." 1-SER-0136-0137. But Plaintiff made no direct allegation of any alleged misrepresentations by Defendants. *See generally id.* His only allegation connecting Fox and News Corp. was his claim that, because ZGM allegedly later

50

formed a company called "Future Service Inc," and Fox, News Corp., and Future Service Inc all had an unspecified degree of shared ownership, "News Corp[.] and [Fox] are also responsible for the actions of ZGM and Future Service Inc." 1-SER-0137. Plaintiff's allegations with respect to intentional misrepresentation also made no mention whatsoever of Lightstorm, despite listing Lightstorm in the cause of action. *See generally* 1-SER-0136-0141.

As yet another basis for affirming dismissal, Plaintiff's intentional misrepresentation claim failed because he only alleged he was promised to be paid if his script was used. 1-SER-0137. As discussed *supra*, regarding the lack of allegations of access and absence of substantial similarity among the works, as a matter of law *Butterfly Driver* was not used. Plaintiff's intentional misrepresentation claim therefore has no legal basis.

And as to each of Plaintiff's ancillary claims, the district court recognized that if re-asserted as stand-alone claims that did not depend on the alleged copyright violation, the claims would still fail because they were "so attenuated and unsubstantial as to be absolutely devoid of merit." 1-ER-15 (citing *Hagans v. Lavine*, 415 U.S. 528, 536 (1974)). This Court should affirm dismissal of Plaintiff's ancillary claims, along with his copyright claims, for any or all of the alternative reasons discussed herein.

51

C.     THE DISTRICT COURT DID NOT ERR IN ANY OF THE OTHER
       WAYS PLAINTIFF ARGUES.

Plaintiff also claims, without support, that Judge Chhabria should have been

disqualified from presiding over the district court proceedings, and that this action

implicates national security and government conspiracy theories.  These claims are

frivolous.

First, Plaintiff did not and cannot meet the standard for moving to disqualify

a judge.  The denial of a motion to recuse or disqualify is reviewed for abuse of

discretion.  *U.S. v. Martin*, 278 F.3d 988, 1005 (9th Cir. 2002).  Plaintiff's

arguments that Judge Chhabria should have been disqualified were based solely on

Judge Chhabria's rulings in Plaintiff's prior cases before the district court: *Briggs*

*v. Universal Pictures*, No. 3:17-cv-6552-VC and *Briggs v. Spacey, et al.*, No. 3:18-

cv-4952-VC.  This is plainly insufficient to constitute the "bias or prejudice"

required for disqualification under 28 U.S.C. sections 144 and 455.  "Prior judicial

rulings unfavorable to a defendant are a basis for appeal, not recusal [or

disqualification]." *United States v. Ford*, 293 F. Supp. 3d 1138, 1140 (E.D. Cal.

2018).  Litigants who simply do not like the way a judge has ruled in the past do

not have grounds to disqualify that judge.  *See id.*; *Herrington v. Sonoma Cnty.*,

834 F.2d 1488, 1502 (9th Cir. 1987) (denying motion to disqualify based on

allegedly biased judge; court held that even where "[t]he judge certainly exhibited

animosity toward [the moving party]," this did not rise to the level of "personal bias").

Second, Plaintiff's arguments about national security demonstrate that paranoia and conspiracy theories are the driving forces behind this vexatious and harassing litigation, from Plaintiff's Complaint all the way through to his Opening Brief before this Court. Plaintiff's Complaint claims that his copyright theories are "matter[s] of national interest," (1-SER-0130-0131), and that the Defendants' alleged actions "threaten national security." (1-SER-0133). Now, on appeal, Plaintiff devotes several pages of his argument to the idea that the district court's dismissal order "[t]hreatens America's status as a world leader, and threatens America itself." AOB at 42. He claims, without evidence, that "[t]here is a tie between President Trump and the theft of the Plaintiff's ideas . . . Trump may be involved in a plan to sell private American data to Russia[, and,] [w]hile in office, President Trump took action in furtherance of this plan." *Id.* at 44.

Plaintiff's case is based on paranoia, wild speculation, and gross implausibilities. The examples referenced here only scratch the surface of the breadth and waywardness of Plaintiff's allegations, most of which are completely unconnected to reality, much less to the frivolous copyright infringement that has been alleged. For all the reasons discussed herein, the Court should put an end to

these fanciful and incessant claims and affirm the district court's dismissal of Plaintiff's Complaint with prejudice.

## VII.   CONCLUSION

Defendants respectfully request that this Court affirm the district court's dismissal of the Complaint in full.


Dated:  March 12, 2021               JASSY VICK CAROLAN LLP


                                By_____*/s/ Jean-Paul Jassy*_____
                                          JEAN-PAUL JASSY
                                   Attorneys for Defendants-Appellees
                                     James Cameron, News Corp.,
                                   Twentieth Century Fox Film Corp.,
                                     and Lightstorm Entertainment

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,875 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word in Times New Roman 14-point font.

Dated: March 12, 2021        JASSY VICK CAROLAN LLP

By      */s/ Jean-Paul Jassy*
JEAN-PAUL JASSY
Attorneys for Defendants-Appellees
James Cameron, News Corp.,
Twentieth Century Fox Film Corp.,
and Lightstorm Entertainment

## CERTIFICATE OF SERVICE

I hereby certify that on March 12, 2021, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated:  March 12, 2021             JASSY VICK CAROLAN LLP


By_____*/s/ Elizabeth Baldridge*_____
ELIZABETH BALDRIDGE
Attorneys for Defendants-Appellees
James Cameron, News Corp.,
Twentieth Century Fox Film Corp.,
and Lightstorm Entertainment